SHARTSIS FRIESE LLP
ARTHUR J. SHARTSIS (Bar #51549)
ashartsis@sflaw.com
MARY JO SHARTSIS (Bar #55194)
mshartsis@sflaw.com
ROBERT E. SCHABERG (Bar #81430)
rschaberg@sflaw.com
JAMES P. MARTIN (Bar #170044)
jmartin@sflaw.com
One Maritime Plaza, Eighteenth Floor
San Francisco, CA 94111
Telephone: (415) 421-6500
Facsimile: (415) 421-2922

Attorneys for Plaintiff
GSI TECHNOLOGY, INC.

**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CV 11 3613** HRL

GSI TECHNOLOGY, INC., a Delaware corporation,

　　　　　Plaintiff,

v.

CYPRESS SEMICONDUCTOR CORPORATION, a Delaware corporation,

　　　　　Defendant.

Case No.

**COMPLAINT FOR FEDERAL AND STATE ANTITRUST VIOLATIONS; UNFAIR COMPETITION**

**JURY TRIAL DEMANDED**

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

　　　　Plaintiff GSI Technology, Inc. alleges against Defendant Cypress Semiconductor Corporation as follows:

## INTRODUCTION

　　　　1.　　Defendant is a leading manufacturer of memory technology and chips known as static random access memory ("SRAM"). SRAM is available in a variety of forms, including low-power asynchronous SRAMs, fast synchronous SRAMs, and dual-port SRAMs. This case involves a continuing unlawful combination and conspiracy to monopolize the market for high-performance, fast synchronous Quad Data Rate SRAMs ("Quad" or "QDR" SRAMs) and Double Data Rate ("DDR") SRAMs optimized for networking applications (collectively "Networking

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SRAMs"). By February 1999, Defendant reached an agreement with two of its principal competitors to share information for the development of new Networking SRAM products. Their purpose was to control access to an emerging market for Networking SRAM technology and to lock in the small number of customers for those products by excluding Plaintiff and other competitors from participation in development of product standards intended to serve the market and foreclosing their ability to enter the market in a timely manner and to compete effectively for those customers.

2.     To prevent Plaintiff and other manufacturers of SRAM from having access to information necessary to compete in the rising market for Networking SRAM, Defendant and its two principal competitors entered into a combination and conspiracy in restraint of trade, which they named the "QDR Consortium" (the "Consortium"). The purpose and intent of the Consortium was to develop standards for Networking SRAM products outside of the open and public standard setting organizations to enable them to get to market before their competitors by exchanging information and agreeing on product standards for their respective products to exclude their existing and new competitors from the market. As a result, the Consortium's competitors, including GSI, were not able to contribute to the standard setting effort and did not have access to specifications and information they would have had in an open standard setting process, such as those conducted by the Institute of Electrical and Electronics Engineers ("IEEE") or the JEDEC Solid State Technology Association ("JEDEC")—the industry recognized standards-setting organizations for memory components. Rather, the Consortium members coordinated their product development by agreeing among themselves on standards that were not available to their competitors.

3.     JEDEC is a leader in developing pro-competitive, open standards for the microelectronic markets, particularly the memory market, and, at the time the Consortium was formed, had a committee charged with the role of developing standards for SRAM. Open standards, such as those promulgated by JEDEC, IEEE and other less formal open standards organizations reduce product vendors' risk by facilitating market acceptance of new technologies, reduce purchasers' risk by facilitating the development of multiple sources of supply for critical

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1  system components and encourage both technological innovation and competitive pricing.

2  Because the memory segment of the semiconductor business is dominated by standardized

3  products at customers' insistence, the failure of a vendor to deliver a product that is sufficiently

4  compliant with the recognized standard for products in that class assures economic failure even if

5  the product offers reasonably desirable and improved characteristics.   Early participation in

6  standard setting efforts has long been recognized by memory vendors as critical to market

7  success.

8       4.    In an open and public standard setting process, all competitors in the market have

9  equal access to the same information, but most critically, have access to that information at the

10  same time, allowing not only for competitive products but also competitive product introduction

11  schedules.  While a vendor has the option to pursue its own unique product development without

12  engaging in open standard setting activities, here the collusion among market entrenched

13  members of the Consortium was with a concerted and anticompetitive intent to reap the benefits

14  of standardization among themselves in order to dominate and control the lucrative emerging

15  market for Networking SRAM by excluding other competitors.

16       5.    Since purchasers only derive benefit from the standardization process if the

17  products produced have virtually identical form, fit and function, vendors of products with

18  identical cost and performance characteristics that differ from the "standard" product even in

19  minor ways cannot effectively participate in the market.  The Consortium was formed to assure

20  that the members would each have access to specific form, fit and function information that was

21  particular to their planned family of Networking SRAM products.  The Consortium's purpose

22  was to protect their members' SRAM market shares by excluding their competitors from having

23  access to information describing the specific form, fit and function specifications and information

24  that would otherwise be available in an open and public standards setting body such as JEDEC or

25  IEEE.  Their illegal combination and conspiracy permitted the Consortium members to control

26  the market by keeping Networking SRAM prices high, locking in the limited number of

27  consumers of Networking SRAM before competitors could develop and market competing

28  products and stalling the introduction of innovative competitive products.

6. GSI has suffered injury by Defendant's and its co-conspirators' conduct, competition has been harmed and consumers have been denied the benefits of innovation in product development and lower prices.

## THE PARTIES

7. Plaintiff GSI Technology, Inc. ("Plaintiff" or "GSI") is a Delaware corporation with its principal place of business in Sunnyvale, California. GSI is in the business of designing, manufacturing and selling high performance memory including fast synchronous SRAMs ("Fast SRAMs") and Low Latency Dynamic Random Access Memory ("LLDRAMs"). Development and technical support activities are conducted primarily in California and Texas. GSI's SRAM die are fabricated in Taiwan and the United States and then sent to GSI facilities in California and Taiwan for final testing and shipment.

8. Defendant Cypress Semiconductor Corporation ("Defendant" or "Cypress") is a Delaware corporation with its principal place of business in San Jose, California. Cypress operates several business units including one focused on high performance Fast SRAMs. On information and belief, Cypress SRAM die are fabricated in the United States and at various locations worldwide. At all relevant times, Cypress has functioned as the leader and principal member of the Consortium and claims to have trademark rights in the generic description "quad data rate" and the descriptive "QDR" acronym, which are used by Cypress and all Consortium members to prevent their use by GSI and others.

## CYPRESS' CO-CONSPIRATORS

9. At various times, the following entities participated as co-conspirators with Cypress in connection with the illegal and anticompetitive conduct alleged in this Complaint, and each has acted in furtherance of the conspiracy:

(a) Micron Technology, Inc. ("Micron"), a Delaware corporation with its principal place of business in Boise, Idaho, and/or its wholly-owned subsidiary, Micron Semiconductor Products, Inc., participated in the formation of the Consortium in February 1999 and in the conspiracy until it withdrew from the SRAM market in 2003.

(b) Integrated Device Technology, Inc. ("IDT"), a Delaware corporation with

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   its principal place of business in San Jose, California, participated in the formation of the

2   Consortium in February 1999 and in the conspiracy.

3           (c)     NEC Corporation ("NEC"), organized under the laws of Japan, with its

4   principal place of business in Nakahara-Ku, Kawasaki, Kanagawa, Japan, and/or its wholly-

5   owned and controlled subsidiaries, NEC Electronics Corporation and NEC Electronics America,

6   Inc., joined the Consortium and the conspiracy in January 2001.  NEC merged with Renesas

7   Technology Corporation in April 2010.

8           (d)     Samsung Electronics Company, Ltd. ("Samsung"), a business entity

9   organized under the laws of South Korea, with its principal place of business in Seoul, Korea,

10  and/or its wholly-owned and controlled subsidiaries Samsung Electronics America and Samsung

11  Semiconductor, Inc., joined the Consortium and the conspiracy in April 2001.

12          (e)     Hitachi, Ltd. ("Hitachi"), a business entity organized under the laws of

13  Japan, with its principal place of business in Tokyo, Japan, and/or its wholly-owned and

14  controlled subsidiary Hitachi America, Ltd. joined the Consortium and the conspiracy in

15  September 2001.

16          (f)     Renesas Technology Corporation ("Renesas"), a business entity organized

17  under the laws of Japan with its principal place of business in Tokyo, Japan (now known as

18  Renesas Electronics Corporation) joined the Consortium and the conspiracy in April 2003.

19  Renesas Technology Corporation was established in April 2003 as a joint venture between

20  Hitachi, Ltd. and Mitsubishi Electric Corp.  Renesas Electronics Corporation is the successor of a

21  merger between NEC and Renesas Technology Corporation in April 2010.

22                          **JURISDICTION AND VENUE**

23      10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 and 28 U.S.C.

24  § 1331, as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and

25  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has supplemental

26  subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367(a).

27      11.     Venue is proper in this judicial district under 15 U.S.C. § 22 as Cypress is found

28  and transacts business in this district, many of the acts and omissions that give rise to the claims

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    in this action occurred in this district, and the damages were suffered by GSI in this district.

2    **INTRADISTRICT ASSIGNMENT**

3        12.    This action is appropriate for assignment to the San Jose Division or San Francisco

4    Division of this Court as both plaintiff and defendant are found and do business in both counties

5    and are headquartered in Santa Clara County.

6    **BACKGROUND OF THE SRAM MARKET**

7        13.    From it's inception until the late-1990s, the SRAM market was dominated by

8    consumer market applications (slow and/or low power SRAMs) and the computer market (Fast

9    SRAMs).   From the mid-1980's until the late-1990's, Fast SRAMs mainly served as external

10   cache memory supporting high-end microprocessors.   For a brief period as Intel's Pentium and

11   Pentium-II processors moved into the consumer market space, the Fast SRAM market was

12   characterized by a sudden and dramatic increase in demand.   The increased demand spawned a

13   surge in the number of SRAM vendors as well as a surge in SRAM unit volume.   In the late

14   1990s, as Pentium-II demand began to wind down in the face of new processor offerings that

15   included cache memory on the processor die, the high-end Fast SRAM market for RISC

16   processor external cache also entered a significant decline for the same reason.

17       14.    At about the same time, telephone networks that were converting from

18   synchronous transmission protocols to ATM (Asynchronous Transfer Mode) were driving early

19   demand for what would later become known as "networking memory."   The demand for growth

20   in Internet bandwidth now drives the demand for memory in the networking market space which

21   continues to grow to this day.   The workloads that networking systems place on memory

22   resources are very different from the workloads placed on memory devices in the computer

23   market, and that has resulted in the need for new memory architectures that are suited to the

24   workloads presented by the networking market.   The formation and exclusionary practices of the

25   Consortium ultimately contributed to numerous SRAM vendors exiting the market by blocking

26   timely access to standardization efforts aimed at addressing the needs of the emerging

27   Networking SRAM market.   As a result, there has been a severe contraction of the SRAM vendor

28   base over the last decade.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 6 -

## THE TECHNOLOGY OF SRAM AND THE SRAM MARKET

15.     The products at issue in this action are the initial and succeeding generations of networking market-oriented fast synchronous Quad Data Rate ("Quad" or "QDR") and Double Data Rate ("DDR") SRAM (collectively "Networking SRAM"). All types of high-performance internet and intranet communication systems incorporate Quad and DDR SRAMs, particularly networking equipment such as switches and routers. Networking SRAMs are designed to improve various performance characteristics critical to networking applications including transaction rate and data bandwidth beyond that of other or previous SRAM devices. Increased transaction rate and data bandwidth are essential to improving the performance of switches and routers that require high-performance access to look-up tables, linked lists and buffer memory. Quad SRAMs have dual unidirectional Double Data Rate input and output ports and come in versions optimized for improved transaction rate and versions optimized for high data bandwidth. DDR Common I/O (in/out) SRAMs from the same family feature a single bidirectional DDR data port and are optimized for read-dominated operations such as table look-ups. In each product family the use of the DDR data transfer protocol maximizes data transfer rates per pin and reduces the number of pins required to connect the RAM to a host device. As the demand for Internet bandwidth continues to grow, the need for regularly doubling the performance of networking memory continues to grow and presents a compelling need for open standardization.

16.     Virtually all semiconductor memory devices store data in arrays of single storage elements, each of which holds a "bit" of data. The pervasive use of personal computers has made DRAM (Dynamic Random Access Memory) a familiar term. DRAM memory is very dense and very low cost but relatively slow. SRAM memory also stores data in arrays of single storage elements, but SRAM bits are approximately 10 times larger than DRAM bits which results in SRAMs being much more costly than DRAMs on a per-bit basis. Historically SRAM arrays have offered specific advantages due to their simplicity and low power. However, for a variety of reasons, including the difference in memory cell design, SRAMs are favored because they can be 10 times or more faster than DRAMs. As a result, it is common to see Fast SRAMs used in applications for which speed is critical and the higher cost justified.

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

17.     Networking SRAMs are Fast SRAMs that have been specifically optimized to address particular networking system needs.  Because there are at least three major memory applications in networking systems, and because the networking market presents a variety of price/performance objectives, several networking memory products have been developed to address those needs.  As a rule, SRAM vendors attempt to put all of the versions that fall within a given price/performance class into a single networking SRAM die design and then through various methods deliver each of the distinctive products required (e.g. Quad Burst of 2, Quad Burst of 4 and DDR Burst of 2 SRAMs) from the base die design.  For this reason, early access to standardization information for all versions is critical to the design of a cost effective die and competitive participation in the market.

18.     At the time the Consortium was formed in 1999, Cypress and its co-conspirators each operated their own manufacturing facilities called fabrication plants or "fabs" as did other SRAM vendors.  GSI and some other SRAM vendors outsourced the fabrication process to third parties, generally known as "foundries."  Today, most integrated circuit ("IC") vendors use foundries or, like Cypress, use a mix of foundry and internal fabs.  These fabrication plants use photolithographic and other processes to create ICs on silicon wafers.  Many more than one IC or die are printed on each wafer.

19.     Manufacturers of modern integrated circuits seek to produce transistors that strike the right balance between speed and power for their intended application while making the transistors and the associated electrical interconnect as small as possible.  Over time, the semiconductor industry has sought to reduce the size of transistors and the associated interconnect and have been rewarded with higher performance and lower power ICs.  However over the last decade the degree of improvement available from shrinking feature sizes has been diminishing and in some cases reversing as parasitic electrical effects that could once be ignored have begun to dominate circuit performance.  As a result, as silicon technology has progressed over the last decade, performance improvements from silicon technology alone have not been able to keep pace with market demand, and architectural innovation has become the primary contributor to adding value and improving IC performance.  This has been particularly true for networking

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    memory, which has made the need for open standards for SRAM products all the more acute.

2                               **THE RELEVANT MARKET**

3        20.    The relevant geographic market is worldwide.

4        21.    The relevant product market is the initial and succeeding generations, including

5    roadmaps and migration paths, of pin-and-function-compatible Quad and DDR SRAMs

6    (Networking SRAMs) that were designed, developed, fabricated, packaged and have been sold in

7    interstate commerce from 2001 to date.

8        22.    The comprehensive portfolio of the Quad and DDR SRAM product family consists

9    of five closely related Networking SRAM architectures.  The product family includes, without

10   limitation, Quad Data Rate Burst 2 ("Quad B2"); Quad Data Rate Burst 4 ("Quad B4"); Double

11   Data Rate Common I/O, Burst 2 ("DDR B2"); Double Data Rate Common I/O, Burst 4 ("DDR

12   B4"); and Double Data Rate Separate I/O, Burst 2("DDR SIO B2").  Each architecture can

13   include versions with data input and output bus widths of 8, 9, 18 and 36 bits.  Over the years,

14   Quad and DDR SRAMs have been upgraded with a series of functional refinements to form, fit

15   and function aimed at improving device performance.  These have been marketed by the

16   Consortium as QDR/DDR (the original generation), QDR/DDR II (second generation),

17   QDR/DDR II+ and recently QDR/DDR II+ Xtreme (refinements or enhancements).  The Quad

18   and DDR SRAMS in the various forms offered by the QDR Consortium members are the de facto

19   industry standard for Networking SRAMs and the SRAM market as a whole.

20       23.    Plaintiff is informed and believes and based thereon alleges that the Consortium

21   developed each of the above evolutionary product changes in secret, releasing information to

22   customers under cover of Non-Disclosure Agreements so that buyers could be ready to accept the

23   new versions of the devices before non-Consortium competitors could learn of the existence or

24   design of the new versions until they were released.  Plaintiff is further informed and believes and

25   based thereon alleges that by signing the Consortium's Non-Disclosure Agreements, customers

26   could not describe the specifics of what they wanted to buy in the future to other competing

27   vendors.  These practices were intended to, and did, keep competitors of the Consortium from

28   having sufficient information to develop timely competing products.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

24.     The market for Networking SRAMs consists of a small number of customers who have a need for a specialized high performance memory.  Quad and DDR SRAMs are purchased primarily by manufacturers of communications networking equipment such as routers and switches, but as they have become the de facto standard Fast SRAMs, they are also being used in military, medical and industrial products as well.  Because of the small number of purchasers in the Fast SRAM market, early market entry is a critical success factor for a networking memory vendor.  The opportunity to get a jump on the market allows a vendor of a new device to lock in the few purchasing customers and exclude its competitors from the market.

25.     The high cost of developing Networking SRAM products is a major barrier to entry.  The lifespan of a generation of routers and switches is typically five to ten years.  A design win (i.e. acceptance of a new product design) early in the life of a new program can present a virtually unassailable advantage to the first suppliers of a particular networking memory device creating a substantial and additional barrier to entry into the Fast SRAM product market.  For example, Cisco Systems, Inc. ("Cisco") has a substantial share of the high-performance networking products market (e.g. routers and switches).  Once a manufacturer such as Cisco selects two or three vendors for the memory in a particular program, the vendors become locked in to that program for years.  Thus, vendors who enter the market late are generally excluded by the lock-in relationship that perpetuates itself.  The end result is that delayed market entry by as little as a few months means that otherwise competitive vendors who were excluded from the program because they could not present a device that was form, fit and function compatible within the customer's design-in window cannot expect to gain acceptance for a decade or more unless one or more of the entrenched vendors fails or exits the market.

## FORMATION OF THE CONSORTIUM
## AND ITS ANTICOMPETITIVE CONDUCT

26.     Cypress, its co-conspirators, and other SRAM vendors, including GSI, recognized the significant new opportunity presented by the emerging networking market and the need for new SRAM products designed to meet the needs of that market. Cypress and its co-conspirators seized that opportunity to form the Consortium with the objective of establishing unfair control

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   over the emerging Networking SRAM market through exclusion of U.S. and foreign vendors

2   from the standardization activities that all vendors had recognized over the preceding two decades

3   as critical to effective SRAM market participation.

4       27.    In February 1999, Cypress, IDT and Micron formed the QDR Consortium to

5   bypass the rules and procedures of open standards organizations such as JEDEC.   The

6   Consortium initially was a combination of these three competitors whose purpose was to define

7   and develop new networking SRAM architectures, ultimately marketed as QDR and 165 pin

8   DDR SRAMs, while excluding other competitors interested in participating in networking SRAM

9   standards development.   The Consortium was organized and operated in a manner separate and

10   apart from, and without any supervision by, any industry recognized standards-setting

11   organization, such as JEDEC, for the purpose of obtaining a competitive advantage over other

12   competitors and eliminating them from the market.   The Consortium members did so by jointly

13   combining their market power to define and promote a family of SRAMs that would address the

14   readily apparent requirements of the networking market with devices that had sufficiently

15   different and secret external characteristics (i.e. collectively known as form, fit and function

16   compatibility) to block timely sourcing by otherwise competitive vendors.   The evaporation of

17   SRAM standardization activities at JEDEC over the last decade in the face of clear demand for

18   higher performance networking SRAMs to support the growing networking market is a direct

19   result of the effectiveness of the anticompetitive activities and conduct of the Consortium and

20   continues to injure GSI, other Fast SRAM competitors, competition and the industry at large.

21       28.    At its inception, the Consortium limited its membership to the smallest number of

22   Fast SRAM vendors necessary to create and maintain a de facto standard while excluding vendors

23   that presented too great of a competitive threat.   Despite GSI's continuous requests for open

24   membership and participation by others, the Consortium excluded GSI and other SRAM vendors

25   that operated using foundries for wafer fabrication, which was perceived at the time as a

26   significant competitive cost advantage.   This exclusionary agreement and combination among the

27   Consortium's members was designed to gain a critical development and marketing advantage

28   over their other competitors in order to corner the market for Networking SRAM, to increase their

- 11 -

1 respective market shares, to retain high prices and to dominate and control the market for

2 Networking SRAM products.

3   29. In late July 1999, Cypress, IDT and Micron announced the formation of the

4 Consortium, and GSI, as a producer of SRAM products, approached the members and requested

5 that it be granted membership.  In response, Cypress notified GSI that it would not be permitted

6 to join the Consortium or participate in the Consortium's standards development.

7   30. Consortium members bypassed JEDEC's standard setting subcommittee for

8 SRAM, which would have enabled all competitors in the SRAM market to have equal and timely

9 access to information and the benefit of its rules.  JEDEC rules require, as a condition of

10 committee membership or committee participation (defined as being present in a committee or

11 task group meeting), that each member or participant agree to abide by JEDEC rules and

12 procedures, including its Patent Policy, to disclose and offer to license the member's/participant's

13 potential essential patent claims on reasonable and non discriminatory ("RAND") licensing terms

14 and conditions.  After being excluded from the Consortium led by Cypress, in October 1999 GSI,

15 IBM, Samsung and Motorola started a separate group known as "SigmaRAM" to facilitate the

16 design and development of an open Networking SRAM standard.  By February 2001, participants

17 in SigmaRAM included GSI, Mitsubishi, Sony, Samsung and Toshiba.  Unlike the Consortium

18 members, the participants in SigmaRAM immediately and actively sought participation of any

19 and all companies (vendors and users) who were interested in participating.  The SigmaRAM

20 participants submitted design specifications of a SigmaRAM product to JEDEC in March 2000 in

21 compliance with JEDEC's standard setting process.

22   31. On January 10, 2000, the Consortium announced that it had completed the initial

23 design of its first QDR and DDR SRAM products and that it intended to define the initial

24 roadmaps and migration paths for this first generation.  The Consortium members had conspired

25 among themselves beyond simple data sheet compliance by sharing design simulations, test

26 vectors, test methodologies, characterization plans and common packaging support to design the

27 first generation of QDR products without the oversight, participation or timely public disclosure

28 of any industry standards-setting organizations and to the exclusion of its members' competitors.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION

1   Certain members of the Consortium publicly referred to this anticompetitive conspiracy as "a

2   uniquely revolutionary arrangement."   Plaintiff is informed and believes and based thereon

3   alleges that the Consortium members also cross-licensed all of each others' patents relating to

4   QDR and DDR SRAMs while avoiding JEDEC's patent licensing policy on RAND terms for all

5   competitors.

6          32.      On February 16, 2000, concurrent with the first product shipments, the Consortium

7   announced that it had completed the specifications of its initial QDR and DDR SRAM

8   architectural design and that data sheets would be available to potential customers.  Complete and

9   accurate data sheets, released publicly in a timely manner, were essential to the ability of

10   competitors to provide competing products in a timely manner.   The timely and ongoing

11   publication of data sheets was a common practice during the traditional "open" standard setting

12   process, but it was not followed by the Consortium.

13          33.      Even though the Consortium announced that it would publish the data sheets for

14   QDR and DDR SRAM, it regularly published those data sheets only after a sufficient time delay

15   that would provide the Consortium members a distinct "time-to-market" competitive advantage

16   over all other SRAM vendors.  It typically took 12 to 24 months to bring a competitive product to

17   market after access to complete and detailed data sheets.  The Consortium further compounded

18   the injury to competitors by publishing only minimally complete data sheets that left numerous

19   significant items undefined or ambiguously defined.  As a result, the Consortium created a barrier

20   to market entry that excluded its competitors for one to two years, thereby assuring Consortium

21   members a generational lock in with Cisco, other major networking equipment manufacturers,

22   network processor vendors and Field-Programmable Gateway Arrays ("FPGA") vendors.

23          34.      Although by 2001 the SigmaRAM participants' efforts at JEDEC were gaining

24   recognition in the industry press, on January 10, 2001, Cisco announced its decision to use the

25   Consortium's Quad SRAM offered by Cypress under the name "QDR SRAM" in a new high

26   volume router program rather than a SigmaRAM product offered by GSI.  Shortly thereafter, the

27   Consortium (Cypress, IDT and Micron) announced that NEC, a vendor with minimal presence in

28   the U.S., was joining the Consortium on January 29, 2001, and on April 2, 2001, the members of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   the Consortium (Cypress, IDT, Micron and NEC) announced that Samsung had withdrawn from

2   SigmaRAM and had joined the Consortium.  Although Samsung continued to develop and sell

3   SigmaRAM products to select programs at Cisco, Plaintiff is informed and believes that

4   Samsung's membership in the Consortium was granted on the condition that Samsung drop all

5   public use, promotion or attribution of the SigmaRAM name in association with its SigmaRAM

6   products to prevent further market acceptance of SigmaRAM competitive products.

7       35.    On June 14, 2001, the Consortium announced the development of the QDR II and

8   DDR II SRAM architecture and that sample devices were already under evaluation.   The

9   Consortium also announced an "optimum packaging strategy," which is critical to product

10  interchangeability.  At the same time, Cypress publicly stated that with QDR II SRAM it had

11  defined its QDR product "family" for the next two and one-half years and further stated that by

12  that time it would be introducing its QDR III SRAM, signaling further exclusionary efforts by the

13  Consortium were underway.

14      36.    On September 24, 2001, the members of the Consortium (Cypress, IDT, Micron,

15  NEC and Samsung) announced that Hitachi was joining the Consortium.   The announcement

16  emphasized that each member of the Consortium "used its own state-of-the-art fabrication

17  facility," a factor that provided no justification for an anticompetitive conspiracy.   Industry

18  analysts estimated that the six members of the Consortium would supply two-thirds of the world-

19  wide unit shipments of Fast SRAM.  By December 2001, Motorola and IBM had both withdrawn

20  from the Networking SRAM market.

21      37.    On October 15, 2001, the Consortium announced the release of data sheets for the

22  QDR II and the DDR II SRAM architectures.  Again, the release of the data sheets months after

23  compliant devices already existed was time-delayed and devoid of essential details, to the

24  detriment of all other competitors.

25      38.    Between November 1, 2001 and August 30, 2002, Cypress and the other members

26  of the Consortium proposed and aggressively promoted adoption of the Consortium's QDR

27  interface to the NPF (Network Processors Forum) Look-Aside Interface working group.   The

28  Look-Aside Interface was intended to facilitate connection of SRAMs, CAMs and other

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION

1  networking devices to network processors. GSI and Sony proposed accommodation of

2  performance improvement features present in the SigmaRAM interface. Although the first

3  release of the LA-1 interface standard accommodated the characteristics of both the QDR and

4  SigmaRAM interfaces, subsequent releases under the editorial direction of Cypress omitted

5  references to SigmaRAM while retaining the SigmaRAM contributions which had since been

6  incorporated into the QDR II and DDR II specification.

7      39.    On October 8, 2002, representatives of GSI and Sony met with a "representative of

8  Micron" with the expressed intent of persuading the Consortium to open and unify future

9  Networking SRAM standardization efforts. Their efforts were unsuccessful, and SigmaRAM

10  ceased to provide an alternative forum to the QDR Consortium by the end of 2002.

11      40.    On March 11, 2003, Micron formally announced that it was exiting the SRAM

12  market, and it accordingly withdrew from the Consortium. GSI again took the initiative to

13  contact Cypress about opening the Consortium to GSI and other interested parties. On March 13,

14  2003, Cypress notified GSI that it was not willing to alter the closed operations of the Consortium

15  and that it would not accept GSI as a member.

16      41.    On January 15, 2004, GSI representatives had another meeting with Cypress

17  representatives to discuss a request by GSI for membership to participate in the Consortium's

18  standard setting. On May 6, 2004, Cypress sent a letter to inform GSI that its membership and

19  participation would not be accepted. According to the Cypress letter, "[A]dding more members

20  at this time would have minimal benefit and simply increase the time to closure on technical

21  issues." Since the Consortium had just lost its largest QDR supplier (Micron), Cypress'

22  justification for denial of GSI's membership was motivated by its anticompetitive and

23  exclusionary intent to retain Micron's market share for itself or for all members of the

24  Consortium.

25      42.    On June 10, 2004, the Consortium announced plans for its third generation of

26  QDR SRAM—QDR-III SRAM, a device that was never produced by Cypress or any other

27  member of the Consortium. The announcement that the Consortium members were developing

28  QDR III SRAM was intended to delay competitive product development and to keep customers

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    from switching to competitive products.  To this day, neither Cypress nor the other members of

2    the Consortium have introduced or sold a QDR III product.  Instead, the Consortium's QDR III

3    propaganda was "vaporware"—specifically intended to paralyze its competitors and preclude

4    them from developing their own new generation devices.  This anticompetitive strategy proved to

5    be extraordinarily effective since the research and development costs associated with a new

6    generation device would approach $3 to $5 million, and neither GSI nor other competitors were

7    prepared to risk such a capital investment only to discover that the Consortium's expected

8    QDR III device, when released, was not pin-function compatible.  Such a development would

9    simply compound the "time-to-market" competitive injury already being suffered by GSI and

10   other Networking SRAM vendors who were excluded from the Consortium.

11        43.    On March 9, 2006, the then-members of the Consortium (i.e. Cypress, Samsung,

12   IDT, NEC and Renesas) announced that they were releasing enhanced QDR II and DDR II

13   products described as QDR II+ and DDR-II+ SRAM, but in keeping with previous practice, data

14   sheets were not publicly available.

15        44.    In March and April of 2007, the industry members of the JEDEC SRAM

16   committee, which included Cypress, IDT, NEC, Samsung, Renesas, GSI and Sony met to discuss

17   the prospect of reviving open, public future SRAM standardization efforts under the auspices of

18   JEDEC.  In response, the Consortium informed the SRAM committee that, while their members

19   would be willing to attend meetings in which GSI, Sony and other SRAM vendors would present

20   their respective proposals for an industry standard, the Consortium members would not make any

21   presentations concerning their developmental efforts.

22        45.    In October 2008, GSI again requested membership and open standard setting and

23   Cypress rejected its request.

24        46.    GSI is informed and believes and based thereon alleges that in January 2011,

25   Cypress and the Consortium members advised customers that planning is underway to define and

26   produce a "QDR IV" device.  The Consortium's announcement of a QDR IV generation is, like

27   its announcement of the QDR III generation that has not yet been introduced, intended to prevent

28   customers from switching to competitors' products.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 16 -

47.     GSI is informed and believes and based thereon alleges that in or around late 2010 or early 2011, Samsung ceased development of new Networking SRAMs.  In 2010, Cypress surpassed Samsung as the largest Networking SRAM supplier.

48.     In January 2011, the Consortium again rejected GSI's request for admission to the Consortium and open standard setting.  Yet, on July 15, 2011, Cypress and Renesas, the only remaining Consortium members, via the QDR Consortium's website invited memory manufacturers and customers to apply for non-voting "Adopter" and "Adviser" memberships in the Consortium to obtain and enjoy the benefits of participating in "the definition of performance specifications and features that will support customer roadmaps;" increase the "likelihood of producing a superior product specification;" increase "the likelihood of producing successful products . . . for leading edge products that are multi-sourced;" and "developing working relationships with other industry forums. . . ."

## THE CO-CONSPIRATORS ACTS

## IN FURTHERANCE OF THE CONSPIRACY

49.     From its inception in February 1999 to and including the present date, the Consortium was organized and continuously operated as an illegal horizontal combination and conspiracy between and among direct competitors to restrain trade and monopolize or attempt to monopolize the Networking SRAM product market.  The purpose of the Consortium and the intent of its members was to eliminate or obtain a competitive advantage over their other competitors by jointly combining its members' market power to create exclusive but de-facto Networking SRAM standards and to manipulate the availability of information about those product definitions in such a way as to delay substantially their competitor's entry into a market in which customers highly favor products with more than one source.

50.     From the Consortium's inception in February 1999 to and including the present date, its members knowingly engaged and participated in a continuous and unceasing series of new and independent illegal overt acts that were directly intended to further the illegal purposes of the conspiracy and to accomplish its ultimate goal of monopolizing the market for Networking SRAM. Each such independent overt act inflicted new and accumulating anticompetitive damage

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   and injury to GSI and the industry at large, which injuries are continuing to be suffered, to and

2   including the present date.

3        51.    The independent, continuous and illegal overt acts undertaken by the Consortium

4   in furtherance of the conspiracy include, without limitation, the following:

5              (a)    The Consortium was formed primarily by Cypress, and it intentionally

6   limited membership in the Consortium to SRAM vendors who posed a limited competitive threat.

7   Despite continuous requests for open membership and participation by GSI and other competing

8   SRAM vendors, the Consortium specifically excluded them from the Consortium and from open

9   standards setting for Fast SRAM;

10             (b)    From the time of the Consortium's inception in 1999, and in the years

11   thereafter, GSI requested that it be accepted as a member to participate in Networking SRAM

12   standards development with the Consortium members, and on each occasion Cypress, on behalf

13   of the Consortium, denied GSI's requests for membership and participation in the Consortium's

14   standard setting efforts and timely access to the standards being developed by the Consortium.

15   GSI's request for participation and its rejection occurred most recently in January 2011.

16             (c)    Plaintiff is informed and believes and based thereon alleges that, pursuant

17   to their exclusionary agreement, the full terms of which are presently unknown, Cypress had, and

18   exercised, a veto over GSI's numerous requests, including requests in 1999, 2003, 2004, 2008 and

19   2011, to be admitted to membership or participation in the Consortium and for the Consortium to

20   engage in open standard setting through JEDEC's SRAM subcommittee or any other open

21   standard setting process.

22             (d)    The Consortium members exclusionary agreement constituted a group

23   boycott and/or concerted refusal to deal that afforded the Consortium the opportunity to exclude

24   their competing SRAM vendors and to prevent them from entering the Networking SRAM

25   market on a timely and competitive basis;

26             (e)    Plaintiff is informed and believes and based thereon alleges that the

27   Consortium members regularly and continuously communicated with one another by telephone,

28   email or meetings throughout the entire conspiratorial time frame for the purpose of furthering

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 18 -

1   and achieving the illegal purposes of the conspiracy, including without limitation, excluding

2   competitors, sharing proprietary research and development information among themselves in a

3   manner that exceeded simple data sheet compliance, delaying publication of data sheets and

4   omitting critical information and data until they had initial and new generation products

5   market-ready to lock-up customers before competitors had access to standards necessary to

6   develop and market competing products;

7           (f)    The Consortium selectively added new members to its conspiracy when

8   compelled to do so by circumstances that threatened to compromise the effectiveness of the

9   Consortium (e.g. when the participation of Samsung in SigmaRAM was giving SigmaRAM too

10   much credibility) or when the geographic market footprint of the competitor was minimal in the

11   U.S. market and its participation could enhance the image of the Consortium (e.g. the inclusion of

12   Toshiba / Renesas / NEC);

13           (g)    As a direct result of its exclusionary combination and conspiracy from

14   1999 to and including the present date, the Consortium collectively designed, developed,

15   manufactured and introduced generations of its QDR and DDR SRAM and several enhanced

16   product family devices into the market free of any timely and effective competition from any

17   other networking SRAM vendors.  Its initial QDR and DDR SRAM was announced in February

18   2000 concurrent with its first product shipments and public release of data sheets.  The next

19   generation, QDR II and DDR II SRAM, was announced in June 2001 concurrent with release of

20   early samples to customers, but QDR II and DDR II data sheets were not made public until

21   October.  In May 2004 the Consortium previewed the QDR III and DDR III without releasing any

22   significant details about the device.  The Consortium announced the QDR II+ and DDR II+ in

23   March 2006 but did not make data sheets available to the public.  Over the next four years,

24   Consortium members sampled a succession of variants on the QDR II+ and DDR II+ theme, each

25   altering elements of the device definition, keeping the public definition of a QDR II+ and

26   DDR II+ in flux until late 2010.  Variants were released without public announcement, but in

27   each case delivery of products to customers predated public release of data sheets.  The most

28   recent enhancement is the Consortium's "QDR II+ Xtreme" SRAM, which is scheduled to

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    sample in mid-2011.  A public release date for the QDR II+ Xtreme data sheets has not been

2    announced.  The Consortium's introduction of each generation and each enhancement of its QDR

3    and DDR SRAM products inflicted a new, independent and accumulating damage and injury on

4    GSI, other SRAM competitors and competition in general by excluding them from access to

5    information and extending the lock in of Networking SRAM customers to QDR products.

6           (h)    Plaintiff is informed and believes and based thereon alleges that the

7    Consortium members cross-licensed each others' patents relating to QDR and DDR SRAMs and

8    by avoiding JEDEC's RAND and Patent Policy, the Consortium attempted to further its control

9    of the Networking SRAM market.

10          (i)    The Consortium and its members have repeatedly refused numerous

11   requests to operate as an "open" forum of competitive SRAM vendors or under the auspices and

12   supervision of an industry recognized standards setting organization, such as JEDEC, even

13   though all Consortium members are members of JEDEC.

14   52.    In addition to these acts and in furtherance of the conspiracy, in February 2002,

15   Cypress filed an application with the U.S. Patent and Trademark Office to register "QDR" as a

16   trademark.  The application claimed that Cypress had used "QDR" since June 30, 1999.  The

17   Trademark Office issued an Office Action on June 17, 2002, refusing to register "QDR" as a

18   trademark because it did not "function as a mark," and because it was "merely descriptive" of a

19   generic group of products and not sufficiently distinctive to merit registration.   Between

20   September 10, 2002, and June 3, 2005, Cypress sought reconsideration of two Office Actions that

21   rejected its application to register "QDR" as a mark.  On June 3, 2005, the Trademark Office

22   issued its Final Refusal denying Cypress' last request for reconsideration.  Notwithstanding the

23   Trademark Office denial of trademark protection, Cypress and members of the Consortium

24   continued to claim QDR as a trademark for their Networking SRAM products in order to gain a

25   market advantage over their competitors and to preclude their competitors from using the

26   acronym QDR in describing their competing products to the injury and damage of GSI and other

27   competitors.

28   53.    On August 3, 2005, Cypress amended its trademark application requesting that

- 20 -

1   "QDR" be placed on the Supplemental Register. This request was granted on December 6, 2005.

2   By amending the application to seek registration on the Supplemental Register, Cypress did not

3   alter the conclusion of the Trademark Office that QDR was "merely descriptive" and therefore

4   could not be registered on the Principal Register.

5        54.    On December 3, 2010, Cypress filed a new application to register QDR as a

6   trademark on the Principal Register, contending that the mark had become distinctive of the

7   goods through Cypress' exclusive and continuous use of the mark for at least five years. Such

8   exclusive and continuous use was gained by false representations that QDR was a valid trademark

9   of Cypress and/or members of the Consortium. The Trademark Office issued an Office Action on

10  March 10, 2011 rejecting Cypress' application on the ground that the proposed mark was "merely

11  descriptive" and not distinctive and had not acquired distinctiveness through use by Cypress.

12  Cypress challenged this Office Action on May 2, 2011, but the Trademark Office maintained its

13  rejection on the same grounds and issued its Final Refusal on May 25, 2011.

14       55.    From June 17, 2002, to and including May 25, 2011, Cypress knew that the

15  Trademark Office had continuously refused to accept its application to register "QDR" as a

16  trademark and that it was "merely descriptive" and "not distinctive." Cypress nonetheless made

17  continuous public assertions that it possessed enforceable trademark rights to "QDR," which were

18  false misrepresentations of fact and an unfair business practice intended to further entrench its

19  customer lock in and chill the development and sale of competing Networking SRAM under the

20  generic and well-known acronym of "QDR." For example, in March 2004, Cypress demanded

21  that GSI "cease and desist" from using "QDR" in connection with the promotion of its

22  Networking SRAM before a JEDEC Committee, claiming that "Cypress is the owner of the

23  family of QDR trademarks." In truth and fact, Cypress knew that "QDR" did not constitute a

24  protectable trademark proprietary to Cypress or Consortium members, and knew that it had no

25  legal right to demand that GSI cease and desist using a descriptive or generic acronym that

26  merely described a Networking SRAM product. Cypress's continuous course of conduct during

27  the period 2002 to 2011 in publicly asserting that it has a trademark in the "QDR" acronym has

28  harmed GSI by its resulting inability to promote its quad data rate products as QDR products.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

**THE ANTICOMPETITIVE EFFECTS OF CYPRESS'S CONDUCT ON**

**PLAINTIFF, COMPETITION AND CONSUMERS**

56.     By their conduct, the Consortium members excluded GSI and other competitors by jointly combining their market power to create exclusive but de facto product standards, to lock in customers for Networking SRAM and to manipulate the availability of information about product definitions to impede and delay GSI's and other competitors' entry into the Networking SRAM market.  In 2003, GSI introduced its first Quad/DDR SRAM product, but due to its late arrival it fared poorly in the market.   Although GSI was able to introduce a minimally competitive Networking SRAM product in 2006, and from 2007 to 2010 introduced succeeding higher density and faster products, GSI was unable to gain market acceptance as a result of the conduct alleged. In 2010, GSI introduced a third generation Quad and DDR SRAM family marketed as SigmaQuad-IIIe SRAMs, a product that doubled the performance capabilities of the QDR II+ SRAMs.  Whether this product will gain market acceptance remains uncertain due to Cypress' continuing lock in of customers and collusion with Consortium members.     Cypress' anticompetitive conduct and refusal to engage in open and public standard setting have caused, and are causing, continuing damage to GSI and to competition.

57.     As a result of the anticompetitive conduct alleged above, Cypress has in fact illegally delayed and impeded GSI's ability to develop and market competitive products and has stifled innovation in the Networking SRAM market to the injury of GSI, other competitors and competition and to the detriment of customers and consumers.

58.     The Consortium's successful exclusion of GSI as a competitor in the Networking SRAM market was continuous from 2000 to date and prevented GSI from accurately calculating, knowing or reasonably projecting the actual volume of business, market share or profits it would have achieved or enjoyed in an open and competitive market free of the anticompetitive conduct of Cypress and its co-conspirators and its resulting restraints  As a direct result of Cypress' and the Consortium members' illegal and continuing combination and conspiracy from 2000 to 2011, GSI was previously incapable of determining or quantifying the damages and injury it suffered because it previously had not experienced or known the size and conditions of an emerging

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 22 -

1 │ market that was effectively free of the anticompetitive effects of the illegal restraints of trade.

2 │ Any attempt to state a claim to recover the full extent of GSI's future market share damage would

3 │ have been speculative and conjecture.

4 │      59.     Cypress and members of the Consortium through their acts and conduct have

5 │ illegally dominated and controlled the Networking SRAM market to the further injury of GSI,

6 │ competition and to the detriment of their customers and consumers.

**FIRST CLAIM FOR RELIEF**

**(Violation of Section 1 of the Sherman Act—**

**Combination and Conspiracy In Restraint Of Trade)**

10 │      60.     Plaintiff GSI incorporates by this reference each and every allegation of

11 │ paragraphs 1-59 above.

12 │      61.     Plaintiff GSI is informed and believes and based thereon alleges that Defendant

13 │ Cypress and its co-conspirators have at all times relevant hereto, including the present, possessed

14 │ substantial market power in the Networking SRAM market.

15 │      62.     Cypress and its co-conspirators agreed, combined and conspired to form the QDR

16 │ Consortium, the intended purpose of which was and is to harm or eliminate competitors of the

17 │ members of the Consortium.

18 │      63.     In furtherance of the conspiracy, the Consortium members secretly developed

19 │ among themselves, and for their mutual benefit, de facto standards outside of any open and public

20 │ standard setting organizations to enable them to gain and maintain their monopoly share of the

21 │ Networking SRAM market by exchanging information and by agreeing collectively on, and

22 │ sharing with each other, product development plans for their respective products. Each member

23 │ of the Consortium had full access to substantially complete form, fit and function specifications

24 │ and information that was particular to their planned family of Networking SRAM at each stage up

25 │ to and including the announced release of QDR II+ Xtreme. By excluding their existing, new or

26 │ potential competitors from the emerging Networking SRAM market and by their concerted

27 │ refusal to participate in industry accepted public and open standard setting processes, competitors

28 │ did not have timely access to form, fit and function specifications and information that would

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1  have been available in an open standard setting process such as those conducted by IEEE or

2  JEDEC.

3        64.    The illegal conspiracy and collusion among the Consortium members allowed

4  them to reap the benefits of standardization among themselves and to restrain trade and

5  monopolize the lucrative market for Networking SRAM by excluding all of their non-member

6  competitive vendors from the market and locking in contracts with key customers.    The

7  Consortium's control of the market had the effect of keeping Networking SRAM prices high,

8  locking in the limited number of consumers of Networking SRAM before competitors could

9  develop and market competing products and stalling the introduction of innovative competitive

10  products.

11        65.    As more fully alleged above, the independent, continuous and illegal overt acts

12  undertaken by Cypress and members of the Consortium in furtherance of the conspiracy include,

13  without limitation, the following:

14              (a)    agreeing to develop product standards among themselves as the top

15  vendors of Networking SRAM in a non-public, collusive effort to lock in major customers before

16  their competitors could develop a competitive product;

17              (b)    excluding GSI from participation in standard setting to delay its ability to

18  enter the market;

19              (c)    repeatedly exercising Cypress' veto power in 1999, 2003, 2004, 2008 and

20  2011 to exclude and injure GSI as a competitor from participating in the Consortium's standard

21  setting;

22              (d)    engaging in a group boycott or concerted refusal to deal with GSI and other

23  non-member competitors;

24              (e)    meeting and exchanging information regarding product development,

25  sharing proprietary research and development information, delaying publication of data sheets to

26  delay entry of GSI and other competitors' products and announcing new products without any

27  intention of introducing them in the market in order to stifle innovation and competition and

28  extend the lock in with customers;

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

(f)     selectively adding new members who would have otherwise threatened to compromise the effectiveness of the Consortium or who enhanced the image of the Consortium but had no strong U.S. presence;

(g)     collectively designing, developing, introducing and enhancing new products resulting from their conspiratorial efforts;

(h)     cross-licensing each others' patents or other intellectual property related to QDR SRAMs and/or DDR SRAMs and circumventing JEDEC's standards setting RAND rule and Patent Policy;

(i)     refusing to participate in open standard setting while conspiring together to set product standards that would be available first only to Consortium members in order to delay other competitors' market entry;

(j)     representing that "QDR" and "quad data rate" were Cypress or Consortium trademarks to preclude other competitors from using these generic designations for their products to injure or exclude them altogether from the market from at least 2002 to the present.

66.     A not insubstantial amount of interstate commerce in the Networking SRAM market has been—and continues to be—affected by the anticompetitive collusive and conspiratorial conduct of Cypress and its co-conspirators, and this conduct has inflicted and continues to inflict significant damage and injury on GSI, other competitors and their respective customers, as well as the integrated circuits industry in general consisting of lost market share, lost revenue and lost technological product innovation that never came to market as a direct result of the Consortium's conspiracy that delayed and impeded effective and timely research and development.

67.     As a result of the anticompetitive collusive and conspiratorial conduct of Cypress and its co-conspirators in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff has been injured and continues to be injured in its business and property in an amount to be determined at trial, which amount shall be trebled in accordance with 15 U.S.C. § 15.

68.     As a result of the anticompetitive collusive and conspiratorial conduct of Cypress and its co-conspirators in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff has

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1   suffered and will continue to suffer irreparable harm unless Defendant is restrained and enjoined

2   from continuing its wrongful actions intended to destroy Plaintiff's business reputation and

3   goodwill and unless this Court orders Defendant to cease and desist the conduct alleged herein on

4   such terms as are just and reasonable.

**SECOND CLAIM FOR RELIEF**

**(Violation of California Business & Professions Code**

**Sections 16720 and 16726—for Unlawful Restraints of Trade)**

8       69.     Plaintiff GSI incorporates by this reference each and every allegation of

9   paragraphs 68 above.

10      70.     Defendant Cypress' anticompetitive conduct as alleged herein constitutes a

11   violation of Section 16720 and 16726 of the California Business and Professions Code.

12      71.     A not insubstantial amount of intrastate and interstate commerce in the relevant

13   market has been—and continues to be—affected by Cypress' illegal conduct, and Cypress'

14   conduct has harmed GSI and has harmed competition.

15      72.     As a result of Cypress' violations of Section 16720 and 16726 of the California

16   Business & Professions Code, GSI has been injured and continues to be injured in its business

17   and property in an amount to be determined at trial, which amount is to be trebled in accordance

18   with Section 16750 of the California Business & Professions Code.

19      73.     As a result of Cypress' conduct and actions in violation of Sections 16720 and

20   16726 of the California Business & Professions Code, Plaintiff has suffered and will continue to

21   suffer irreparable harm unless Defendant is restrained and enjoined from continuing its wrongful

22   actions intended to destroy Plaintiff's business reputation and goodwill and unless this Court

23   orders Defendant to cease and desist the conduct herein alleged on such terms as are just and

24   reasonable.

**THIRD CLAIM FOR RELIEF**

**(Violation of California Business & Professions Code**

**Sections 17200 et seq.—Unfair Competition)**

28      74.     Plaintiff GSI incorporates by this reference each and every allegation of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION

1 paragraphs 73 above.

2      75.    Defendant Cypress' conduct as alleged herein constitutes unlawful and/or unfair

3 acts or practices in violation of California Business & Professions Code section 17200 *et seq.*

4 Among other acts, Cypress has violated the Sherman Act (15 U.S.C. § 1 *et seq.*), the Clayton Act

5 (15 U.S.C. § 12 *et seq.*), and the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), by the

6 unlawful conduct described hereinabove.

7      76.    By its willful acts to exclude GSI from the market and to harm GSI and other

8 competitors in the Networking SRAM market in violation of the federal and California antitrust

9 laws, Cypress has engaged in unlawful and unfair business practices in violation of California

10 Business and Professions Code section 17200, *et seq.*

11      77.    As a direct and proximate result of the foregoing unlawful and unfair agreements,

12 acts and practices of Cypress, Plaintiff has suffered and will continue to suffer irreparable harm,

13 to its business and property and to its business reputation and good will.

14      78.    Defendant Cypress intends to continue its wrongful actions and unless restrained

15 and enjoined, will do so. Plaintiff's remedy at law is inadequate to compensate GSI for the harm

16 inflicted and threatened by Defendant.

17 **PRAYER**

18      WHEREFORE, PLAINTIFF GSI PRAYS for judgment against Defendant Cypress as

19 follows:

20      1.    For treble damages in an amount to be determined at trial on the First and Second

21 Claims for Relief.

22      2.    For entry of a preliminary and permanent injunction on all Claims for Relief

23 prohibiting Defendant Cypress, its officers, directors, employees, and all persons acting in concert

24 with them or on Defendant's behalf from pursuing the acts, practices and policies complained of

25 herein, including agreeing on non-public product standards with its competitors or engaging in

26 anticompetitive conduct to exclude, eliminate or harm GSI or other competitors or potential

27 competitors and prohibiting Defendant from continuing its unfair and illegal business acts and

28 practices.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    3.    For attorneys' fees and costs incurred in this action.

2    4.    For such other and further relief as the Court deems just and proper.

3    DATED: July 22, 2011                              SHARTSIS FRIESE LLP

4

5                                                      By:_____

6                                                           ARTHUR J. SHARTSIS

7                                                      Attorneys for Plaintiff
                                                       GSI TECHNOLOGY, INC., a Delaware
8                                                      corporation

9                          **DEMAND FOR JURY TRIAL**

10        In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, GSI hereby

11   demands a trial by jury on all issues triable by a jury.

12   DATED: July 22, 2011                              SHARTSIS FRIESE LLP

13

14                                                     By:_____

15                                                          ARTHUR J. SHARTSIS

16                                                     Attorneys for Plaintiff
                                                       GSI TECHNOLOGY, INC., a Delaware
17                                                     Corporation

18   8301\001\1730006

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR FEDERAL AND STATE
ANTITRUST VIOLATIONS; UNFAIR COMPETITION