United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GSI TECHNOLOGY, INC., | CASE NO. 5:11-cv-03613 EJD |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| CYPRESS SEMICONDUCTOR CORPORATION, | [Docket Item No. 14] |
| Defendant. | |
| _____/ | |

Presently before the court is Defendant Cypress Semiconductors Corporation's ("Defendant") Motion to Dismiss the Complaint filed by Plaintiff GSI Technology, Inc. ("Plaintiff"). <u>See</u> Docket Item No. 14. Plaintiff filed written opposition to the motion. The court found this matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and previously vacated the hearing date.

This court has subject matter jurisdiction under 28 U.S.C. § 1337 and 28 U.S.C. § 1331, as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This court also has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367(a). For the reasons explained below, Plaintiff's Motion to Dismiss will be denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The allegations contained in this section are taken largely from the Complaint. Plaintiff and Defendant are manufacturers of memory technology and chips known as static random access

1

United States District Court
For the Northern District of California

1  memory ("SRAM").  See Compl., at ¶¶ 1-2.  The SRAM market consists of a small number of

2  customers making early market entry a critical success factor for networking memory vendors.  See

3  id., at ¶ 24.  Customers in the SRAM market demand standardized products, thus it is critical for

4  manufacturers to comply with recognized standards.  See id., at ¶ 3.  The Institute of Electrical and

5  Electronics Engineers ("IEEE") and the JEDEC Solid State Technology Associations ("JEDEC") are

6  two recognized standard-setting organizations for memory components.  See id., at ¶ 2.  These

7  organizations provide an open and public standard setting process, in which all competitors in the

8  market have equal access to the same information at the same time allowing for competitive

9  products and competitive product introduction schedules.  See id., at ¶¶ 3-4.

10      In February 1999, Defendant decided to pursue its own unique product development and

11  bypass the open standard setting processes provided by the IEEE and the JEDEC.  See id., at ¶¶ 1, 4.

12  To achieve this goal, Defendant and two principal competitors, Integrated Device Technology, Inc.

13  ("IDT") and Micron Technology, Inc. ("Micron"), entered into a combination, which they named the

14  "QDR Consortium" (the "Consortium").  See id., at ¶ 3.  The purpose of the Consortium was to

15  develop standards for higher performance networking SRAM products outside of the open and

16  public standard setting organizations to obtain a competitive advantage over other competitors.  See

17  id., at ¶ 2.  The Consortium members shared information and combined their market power to define

18  and promote a family of SRAMs that would address the new market demand.  See id., at ¶ 27.

19  Despite Plaintiff's continuous request for open membership and participation by others, the

20  Consortium excluded Plaintiff and other SRAM vendors.  See id., at ¶ 28.

21      After being excluded from the Consortium, Plaintiff, IBM, Samsung, and Motorola started a

22  separate group known as "SigmaRAM" to facilitate the design and development of an open SRAM

23  standard.  See id., at ¶ 30.  Unlike the Consortium members, the members in SigmaRAM opened

24  participation to any company and complied with JEDEC's standard setting process.  See id., at ¶ 30.

25      On February 16, 2000, the Consortium announced that it had completed the specifications of

26  its initial QDR and DDR SRAM architectural design.  See id., at ¶ 32.  Even though the Consortium

27  announced that it would publish the data sheets for QDR and DDR SRAM, it only did so after a

28  sufficient time delay.  See id., at ¶ 33.  With the time delay, the Consortium members had a "time-to-

2

United States District Court

For the Northern District of California

1   market" competitive advantage over all SRAM vendors.  See id., at ¶ 33.  The Consortium further

2   compounded the injury to competitors by publishing only minimally complete data sheets.  See id.,

3   at ¶ 33.  Through these actions, the Consortium created a barrier to market entry that excluded its

4   competitors for one to two years, thereby assuring Consortium members a generational lock in with

5   Cisco, other major networking equipment manufacturers, network processor vendors and Field-

6   Programmable Gateway Arrays ("FPGA") vendors.  See id., at ¶ 33.

7         After Cisco decided to use the Consortium's Quad SRAM, the membership of the

8   Consortium has been shifting.  In January 2001, the Consortium announced that NEC Corporation

9   was joining the Consortium.  See id., at ¶ 34.  Thereafter, in April 2001 Samsung withdrew from

10  SigmaRAM and joined the Consortium.  See id., at ¶ 34.[1]  On September 24, 2001, Hitachi, Ltd.

11  ("Hitachi") joined the Consortium.  See id., at ¶ 35.  Currently, the Defendant and Renasas

12  Electronic Corporation ("Renesas") are the only members of the Consortium.  See id., at ¶ 48.

13  Defendant has functioned as the leader and principal member of the Consortium since its inception.

14  See id., at ¶ 8.

15        The Consortium members, through their combined market power and limited membership,

16  created exclusive but de facto product standards, which allowed them to lock in customers and

17  impede entry into the SRAM market, thereby harming competition and consumers.  See id., at ¶ 56.

18  Plaintiff believes that pursuant to the Consortium's exclusionary agreement, the full terms of which

19  are presently unknown, Defendant had, and exercised, a veto over Plaintiff's numerous requests,

20  including in 1999, 2003, 2004, 2008, and 2011, to be admitted to participation in the Consortium.

21  See id., at ¶ 51(c).  The Consortium and its member have repeatedly refused requests to operate as

22  an "open" forum of competitive SRAM vendors or to operate under the supervision of an industry

23  recognized standards setting organization, such as JEDEC.  See id., at ¶ 51(I).  As a direct result of

24  the Consortium's exclusionary combination from 1999 to and including the present date, the

25  Consortium collectively designed, developed, manufactured and introduced generations of its QDR

26

27        [1] Plaintiff believes that Samsung's membership in the Consortium was granted on the

28  condition that Samsung drop all public use, promotion or attribution of the SigmaRAM name.  See
    Compl., at ¶ 34.

Case No. 5:11-cv-03613 EJD
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court

For the Northern District of California

1   and DDR SRAM and several enhanced product family devices in the market free of any timely and

2   effective competition from any other networking SRAM vendors.  See id., at ¶ 51(g).  With each

3   new product released, the Consortium delayed the public release of its data sheets inflicting

4   independent and accumulating injury on Plaintiff and other SRAM competitors outside the

5   Consortium.  See id., at ¶ 51(g).  In addition, Consortium members also required SRAM customers

6   to sign non-disclosure agreements so that buyers could be ready to accept the new version of devices

7   before non-Consortium competitors could learn of their existence.  See id., at ¶ 23.  By its conduct,

8   the Consortium has also harmed consumers by denying them the benefits of innovation in product

9   development and lower prices.  See id., at ¶ 6.

10      Plaintiff commenced the instant action in this court on July 22, 2011 for (1) violation of

11  section 1 of the Sherman Act, 15 U.S.C. § 1, (2) violation of sections 16720 and 16726 of the

12  California Business & Profession Code, and (3) violation of section 17200 et. seq. of the California

13  Business & Profession Code.  This motion followed.

14                              **II.   LEGAL STANDARD**

15      Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

16  specificity to "give the defendant fair notice of what the. . . claim is and the grounds upon which it

17  rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).  A

18  complaint which falls short of the Rule 8(a) standard may therefore be dismissed if it fails to state a

19  claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "Dismissal under Rule 12(b)(6) is

20  appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a

21  cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir.

22  2008).

23      When deciding whether to grant a motion to dismiss, the court must accept as true all

24  "well-pleaded factual allegations."  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009).

25  The court must also construe the alleged facts in the light most favorable to the plaintiff.  Love v.

26  United States, 915 F.2d 1242, 1245 (9th Cir. 1988).  However, "courts are not bound to accept as

27  true a legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at 555.  Moreover,

28  anything beyond the pleadings generally may not generally be examined.  Hal Roach Studios, Inc. v.

4

Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  But "material which is properly submitted as part of the complaint may be considered."  Twombly, 550 U.S. at 555.

### III.   DISCUSSION

#### A.   First Cause of Action: Violation of § 1 Sherman Act

Plaintiff alleges that Defendant's conduct violated section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 prohibits restraints on trade: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restrain of trade or commerce ... is declared to be illegal."  To prevail on a cause of action for violation of 15 U.S.C. § 1, a plaintiff must plead, "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition."  Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008).

#### i.   Unlawful Agreement

Defendant argues the Complaint fails to allege facts plausibly supporting an inference that Plaintiff's exclusion from the Consortium was the product of an unlawful agreement among competitors.  See Motion, Docket Item 14, at 5.  The court disagrees.

To sufficiently plead the first element of section 1 of the Sherman Act, the complaint must set forth:

> [E]nough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."

Kendall, 518 F.3d at 1047 (quoting Twombly, 550 U.S. at 1965).  In Kendall, the 9th Circuit granted the defendants' motion to dismiss because the plaintiffs had an opportunity to conduct discovery and still did not allege any facts in their amended complaint to support their theory that the defendants conspired with each other to restrain trade.  Id. at 1048.

In this case, the Plaintiff set forth enough factual matter to meet the pleading requirement established in Kendall.  The Complaint alleges that in late July 1999, Defendant, IDT and Micron announced the formation of the Consortium with the purpose of defining and developing new

Case No. 5:11-cv-03613 EJD
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1    networking SRAM architectures.  See Compl., at ¶¶ 27, 29.  From the time of the Consortium's

2    inception in 1999, Defendant, "on behalf of the Consortium" and pursuant to the group's

3    exclusionary agreement, denied Plaintiff's requests in 1999, 2003, 2004, 2008, and 2011 to be

4    admitted to membership in the Consortium.  See id., at ¶ 51(a)-(c).  The Consortium's exclusionary

5    agreement afforded its members the opportunity to exclude their competing SRAM vendors and to

6    prevent them from entering the SRAM market on a timely and competitive basis.  See id., at ¶ 51(d).

7    Although the makeup of the Consortium fluctuated over time, there are still plausible grounds to

8    infer an agreement, especially since Defendant, the leader of the Consortium, has been a member

9    from the group's inception. The allegations of the Complaint sufficiently assert the existence of an

10   unlawful agreement.

11              **ii.        Unreasonable Restraint of Trade**

12          As to the second element, Defendant argues that the Complaint fails to plead that Plaintiff's

13   exclusion from the QDR Consortium unreasonably restrained trade.  See Motion, at 5.  The court

14   disagrees.

15          Section 1 of the Sherman Act prohibits, "[o]nly unreasonable or undue restraints" of trade.

16   OSC Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986) (citing Standard Oil v.

17   United States, 221 U.S. 1, 58-60 (1911)).  Most antitrust claims are, "analyze[d] under a 'rule of

18   reason,' according to which the finder of fact must decided whether the question practice imposes an

19   unreasonable restraint on competition, taking into account a variety of factors . . . ."  California ex

20   rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1133 (9th Cir. 2011) (quoting State Oil v. Khan, 552

21   U.S. 3, 10 (1997)).  "The rule of reason is the presumptive or default standard, and it requires that

22   the antitrust plaintiff to 'demonstrate that a particular contract or combination is in fact unreasonable

23   and anticompetitive.'"  Id. (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  "Some types of

24   restraints, however, have such predictable and pernicious anticompetitive effect, and such limited

25   potential for procompetitive benefit, that they are deemed unlawful per se."  State Oil, 522 U.S. at

26   10.  The Supreme Court has expressed reluctance to adopt per se rules where the "economic impact

27   of certain practices is not immediately obvious."  Dagher, 547 U.S. at 5.

28          Plaintiff alleges that its exclusion from the QDR Consortium, "constituted a group boycott

**United States District Court**
For the Northern District of California

6

United States District Court

For the Northern District of California

1    and/or concerted refusal to deal," warranting a per se analysis.  See Compl., at ¶ 51(d).  Three

2    characteristics indicative of a per se illegal boycott are: "(1) the boycott cuts off access to a supply,

3    facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses

4    a dominant market position; and (3) the practices are not justified by plausible arguments that they

5    enhanced overall efficiency or competition."  Hahn v. Oregon Physicians' Serv., 868 F.2d 1022,

6    1030 (9th Cir. 1988).  Although the Supreme Court recognizes group boycotts as per se illegal, it

7    holds that the category of activities compromising group boycotts, "is not to be expanded

8    indiscriminately."  FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 458 (1986).

9         The allegations in the Complaint do not establish a per se illegal boycott because they do not

10   illustrate that Defendant "cut off" Plaintiff's access to the market.  Here, the Complaint expressly

11   alleges that  has continued to market and sell Networking SRAM products throughout the period of

12   the alleged conspiracy, introducing a new, high-performance product introduced as recently as 2010.

13   See Compl., at ¶ 56.  By its own admission, Plaintiff's efforts to sell its products have been at least

14   "minimally successful."  Id.  Though the Complaint alleges that the Consortium prevented the

15   Plaintiff, "from entering the Networking SRAM market on a timely and competitive basis" (See

16   Compl., at ¶ 51(d)), these accusations alone do not demonstrate a sufficient "cut off" to fall under

17   the narrow category of illegal boycotts.  Therefore, the Complaint's allegations should be analyzed

18   under the "rule of reason."

19        "Under the rule of reason, to decide whether a challenged restraint is unreasonable under the

20   Sherman Act, '[t]he focus is on actual effects that the challenged restraint has had on competition in

21   a relevant market.'"  Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947, 950

22   (9th Cir. 1998) (quoting Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 (9th Cir. 1991)).  To

23   make this showing the plaintiff must establish both that the defendant possessed (1) market power

24   within the relevant market, and that (2) the defendant's conduct harmed competition within that

25   market.  Id. at 951.

26                                a.      Market Power

27        "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the

28   defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a

                                              7

'relevant market' exists and that the defendant has power within that market." <u>Newcal Indus., Inc.</u> <u>v. Ikon Office Solution</u>, 513 F.3d 1038, 1044 (9th Cir. 2008).  In that regard, the Ninth Circuit has held:

> There is no requirement that these elements of the antitrust claim be pled with specificity. An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the facts of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the "relevant market" is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.

<u>Id.</u> at 1045 (citation omitted).

The facts pleaded in this case illustrate the existence of a relevant market and that the defendant has power within that market.  First, the Complaint alleges that in 2001, industry analysts estimated that the Consortium would supply "two-thirds" of Fast SRAM worldwide.  <u>See</u> Compl., at ¶ 36.  Throughout the Complaint, Plaintiff alleges that the goal of the Consortium was monopolization of the market (e.g. ¶ 1), that Defendant and Consortium members combined their market power to exclude competitors (e.g. ¶ 27), and that the Consortium has excluded not only Plaintiff but other competitors from the market (e.g. ¶ 28).  The Complaint further alleges that Defendant was the largest Networking SRAM supplier in 2010.  <u>Id.</u> at ¶ 47. These allegations are sufficient at the pleading stage, as the Ninth Circuit made clear in <u>Newcal Industries, Inc. v. Ikon Office Solution</u>.

**b.    Injury to Competition**

"It can't be said often enough that the antitrust laws protect competition, *not* competitors." <u>United States v. Syufy Enters.</u>, 903 F.2d 659, 668 (9th Cir. 1990).  Consequently, "[t]o succeed on a rule of reason claim, an antitrust plaintiff must prove that the restraint in question injures competition in the relevant market."  <u>Roberts Waikiki U-Drive, Inc. v. Budget Rent-A-Car, Inc.</u>, 732 F.2d 1403, 1408 (9th Cir. 1984) (citing <u>Kaplan v. Burroughs Corp.</u>, 611 F.2d 286, 291 (9th Cir. 1979)).  "In order to plead injury to competition . . . sufficiently to withstand a motion to dismiss, 'a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.'" <u>Brantley v. NBC Universal, Inc.</u>, 675 F.3d 1192, 1198 (9th Cir. 2012) (citing <u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>, 884 F.2d 504, 507–08 (9th Cir.1989)).  A

8

claimant "'must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail.'" Id.  (citing Les Shockley Racing, Inc., 884 F.2d at 508).

"In sketching the outline of an injury to competition . . . the claimant must identify a contract, combination or conspiracy that has an anticompetitive effect.  Courts have held that agreements between competitors in the same market (referred to as 'horizontal agreements') may injure competition." Id.   An example of a horizontal agreement is when, "a group of competitors . . . act in concert to harm another competitor or exclude that competitor from the market and thus 'protect . . . dealers from real or apparent price competition' from the targeted competitor." Id. (citing United States v. Gen. Motors Corp., 384 U.S. 127, 146-147 (1966)).  With a horizontal agreement the harm to one market competitor can be considered an injury to competition, "when the relevant market is both narrow and discrete and the market participants are few." Les Shockley Racing, Inc., 884 F.2d at 508-509.

Here, the Complaint provides an outline of the injury to competition by describing the harmful effects the Consortium's horizontal agreement has on outside competitors.  The Complaint alleges that in February 1999 Defendant reached an agreement with two of its competitors to share information for the development of new Networking SRAM products.  See Compl., at ¶ 1. According to the Complaint, the Consortium used its agreement to exclude, "Plaintiff and other competitors from participation in development of product standards intended to serve the market and their ability to enter the market in a timely manner and to compete effectively for those customers." See id.  Without timely access to product standards, numerous SRAM vendors were forced to exit the market.  See id., at ¶ 14. Additionally, the Complaint alleges that because delayed market entry, even by just a few months, the Consortium locked in the market's few purchasers, including Cisco. See id., at ¶¶ 24, 33.  The Complaint further alleges that competition has been harmed in that customers have been denied the benefits of innovation and product development and lower prices. See id. at ¶ 6.  Since the Complaint alleges a detailed outline of the injury to competition it satisfies the Court's pleading standard.

### iii.    Injury to Plaintiff

Defendant argues that the Complaint does not adequately allege an injury to the Plaintiff.

9

1    See Motion, at 20.  Again, the court disagrees.

2         A plaintiff seeking damages under the antitrust laws must shows that is has been "injured in

3    his business or property" as a result of the claimed offense.  15 U.S.C. § 15(a).  "Antitrust injury is

4    defined not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the

5    type the antitrust laws were intended to prevent and that flows from that which makes defendants'

6    acts unlawful.'"  Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 371 (9th Cir. 2002) (citing

7    Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  The Ninth Circuit has

8    identified four requirements for antitrust injury: (1) unlawful conduct, (2) causing injury to the

9    plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the

10   antitrust laws were intended to prevent.  American Ad Mgmt. Inc. V. Gen. Tel. Co., 190 F.3d 1051,

11   1055 (9th Cir. 1999).  In addition, the Ninth Circuit requires that the injured party be a participant in

12   the same market as the alleged malefactors.  Glen Holly Entm't, 352 F.3d at 372.

13        The Complaint's allegations taken as true show that the Defendant caused an antitrust injury

14   to the Plaintiff under the Ninth Circuit's requirements.  The Complaint alleges that as a result of the

15   Consortium's unlawful exclusion of Plaintiff and other competitors from its private de facto

16   standards setting, Plaintiff has been injured in its ability to market competitive products and to lock

17   in key customers.  See Compl., at ¶ 64.  The Complaint further alleges that as a result of Defendant's

18   conduct, Plaintiff suffered multiple injuries such as lost revenues, lost profits and market share, and

19   the stifling of product innovation.  See Compl., at ¶¶ 56-57, 64, 66.  Plaintiff also alleges that from

20   2007 to 2010 it introduced "succeeding higher density and faster products," however it was, "unable

21   to gain market acceptance as a result of the conduct alleged."  See Compl., at ¶ 56.  Defendant's

22   conduct is the type that antitrust laws were intended to prevent because it allegedly denied

23   consumers, "the benefits of innovation in product development and lower prices."  See Compl., at ¶

24   6.  The court therefore cannot conclude on a motion to dismiss that Plaintiff suffered no injury under

25   the Ninth Circuit's requirements.

26        **B.      Second and Third Cause of Action: Cartwright Act and Unfair Competition**

27             **i.      Cartwright Act**

28        The Cartwright Act is "California's antitrust law" and "was modeled after the Sherman Act."

Case No. 5:11-cv-03613 EJD
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court

For the Northern District of California

1  <u>County of Tuolumne v. Sonora Cmty. Hosp.</u>, 236 F.3d 1148, 1160 (9th Cir. 2001). Accordingly,

2  analysis under the Cartwright Act "mirror the analysis under federal law." <u>Id.</u> (citing <u>Nova Designs,</u>

3  <u>Inc. v. Scuba Retailers Ass'n</u>, 202 F.3d 1088, 1091 (9th Cir. 2000), and <u>Mailand v. Burckle</u>, 20 Cal.

4  3d 367, 375 (1978)); see also <u>Colonial Med. Group, Inc. v. Catholic Health Care West</u>, 2011 WL

5  2938227, at *2 (9th Cir. July 22, 2011) ("the requirements for a claim under California's Cartwright

6  Act are identical to those for a claim under the Sherman Act"). Consequently, Plaintiff's Cartwright

7  Act claim should not be dismissed for the same reasons as its Sherman Act claim.

8              **ii.      Unfair Competition Claim**

9          Business and Professions Code section 17200 governs anti-competitive business practices

10  and has a major purpose in preserving fair business competition. <u>Belton v. Comcast Cable Holdings,</u>

11  <u>LLC</u>, 151 Cal. App. 4th 1224, 1233 (2007). Section 17200, "borrows violations of other laws and

12  treats them as unlawful practices that the unfair competition law makes independently actionable."

13  <u>Id.</u> Plaintiff's Unfair Competition Claim is expressly predicated on Defendant's alleged violations

14  of the Sherman and Cartwright Acts. <u>See</u> Compl., at ¶ 75-76. Since Defendant's Motion depends

15  on the assumption that Plaintiff has no claim under the Sherman and Cartwright Acts, the motion to

16  dismiss this claim will be denied.

17       **C.      Statute of Limitations**

18          Finally, Defendant claims that Plaintiff's claims are barred by the statute of limitations. <u>See</u>

19  Motion, at 22. The court disagrees.

20          Plaintiff's claims are subject to a four-year limitations period, which runs from the date cause

21  of action accrues. <u>See</u> 15 U.S.C. § 15(b) (Sherman Act); Cal. Bus. & Prof. Code § 16750.1

22  (Cartwright Act); Cal. Bus. & Prof. § 17208 (Unfair Competition Law). While private antitrust

23  claims are subject to four-year statute of limitations, a new cause of action arises "each time the

24  plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time."

25  <u>Hennegan v. Pacifico Creative Serv.</u>, 787 F.2d 1299, 1300 (9th Cir. 1986) (citing <u>In re Multidistrict</u>

26  <u>Vehicle Air Pollution Litig.</u>, 591 F.2d 68, 70 (9th Cir. 1979)). If a plaintiff, "alleges a continuing

27  violation, an overt act by the defendant is required to restart the statute of limitations and the statute

28  runs from the last overt act." <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 237 (9th Cir.

Case No. 5:11-cv-03613 EJD
ORDER DENYING DEFENDANT'S MOTION TO DISMISS

United States District Court

For the Northern District of California

1  1987).  An overt act will restart the statute of limitations if: (1) it is a new and independent act that is

2  not merely a reaffirmation of a previous act; and (2) it inflicts new and accumulating injury on the

3  plaintiff.  Id. at 238.

4      Plaintiff has alleged continuing violations and corresponding injuries suffered during the

5  limitations period.  The Complaint alleges that in October, 2008, and in January, 2011, Plaintiff

6  requested membership in the Consortium and open standard setting, which requests were rejected as

7  part of a continuing effort to exclude Plaintiff as a competitor from the Networking SRAM market.

8  See Compl.,  at ¶ 45, 48, 51(c).  The overt acts alleged in the Complaint are not limited only to

9  denials of membership.  The Complaint also alleges that between 2007 and 2010, the Consortium

10  announced and offered a succession of variants on their second generation Networking SRAM

11  device, each of which altered the elements of the devices' definitions in order to keep the public

12  definitions in flux until late 2010, and each of which caused further injury to Plaintiff.  See id., at ¶

13  51(g).  As alleged in the Complaint, the "Consortium's introduction of each generation and each

14  enhancement of its QDR and DDR SRAM products inflicted new, independent and accumulating

15  damage and injury on Plaintiff, other SRAM competitors and competition in general by excluding

16  them from access to information and extending the lock in of Networking SRAM customers to QDR

17  products."  See id., at ¶ 51(g).  The overt actions that allegedly occurred during the four years prior

18  to the filing of the Complaint are independents actions that caused further injury to the Plaintiff,

19  therefore they satisfy the statute of limitations.

20              **IV.   ORDER**

21      Based on the foregoing, Defendant's Motion to Dismiss is DENIED.

22  **IT IS SO ORDERED.**

23

24  Dated: July 6, 2012

25                                          EDWARD J. DAVILA
                                            United States District Judge

26

27

28

Case No. 5:11-cv-03613 EJD
ORDER DENYING DEFENDANT'S MOTION TO DISMISS