UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| GSI TECHNOLOGY, INC., | ) | Case No.: 5:11-CV-03613-EJD |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| v. | ) | **JUDGMENT** |
| | ) | |
| CYPRESS SEMICONDUCTOR | ) | |
| CORPORATION, | ) | |
| | ) | **[Re: Docket No. 86]** |
| Defendant. | ) | |
| | ) | |

Plaintiff GSI Technology Inc. ("GSI" or "Plaintiff") brings the instant action against Defendant Cypress Semiconductor Corporation ("Cypress" or "Defendant") asserting unfair competition and violations of federal and state antitrust laws.  Presently before the Court is Cypress' Motion for Summary Judgment.  Dkt. No. 86.  GSI opposes that motion.  Having carefully reviewed the parties' briefing and considered the parties' arguments from the hearing on October 21, 2014, the Court DENIES Cypress' Motion for Summary Judgment for the reasons explained below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

GSI and Cypress are developers of Static Random Access Memory ("SRAM") products.  Since the SRAM market consists of a small number of customers, early market entry is critical to a vendor's success.  Customers in the SRAM market demand standardized products, and it is therefore critical for manufacturers to comply with recognized standards.  The Institute of

1

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Electrical and Electronics Engineers ("IEEE") and the JEDEC Solid State Technology

2  Associations ("JEDEC") are two recognized standard-setting organizations for memory

3  components.  These organizations provide an open and public standard setting process, in which all

4  competitors in the market have equal access to the same information at the same time allowing for

5  competitive products and competitive product introduction schedules.

6      In 1999, Cypress and two of its competitors, Integrated Device Technology, Inc. ("IDT")

7  and Micron Technology, Inc. ("Micron"), entered into a combination which they named the "QDR[1]

8  Consortium" (the "Consortium").  The purported purpose of the Consortium was to develop

9  standards for higher performance networking SRAM products outside of IEEE and JEDEC.  The

10  Consortium members shared information and combined their market power to define and promote

11  a family of SRAMs that would address the new market demand.  ████████████████████

12  ████████████████████████████████████████████████████████████████████

13  ████████

14  ████████████████████  GSI, IBM, Samsung, and Motorola started a separate group known as

15  "SigmaRAM" in order to facilitate the design and development of an open SRAM standard.

16  ████████████████████████  the members in SigmaRAM opened participation to any

17  company and compiled with JEDEC's standard setting process.

18      On February 16, 2000, the Consortium announced that it had completed the specifications

19  of its initial QDR and DDR[2] SRAM architectural design.  Even though the Consortium announced

20  that it would publish the data sheets for QDR and DDR SRAM, it only did so after a time delay.

21  With that delay, GSI alleges the Consortium members obtained a "time-to-market" competitive

22  advantage over all SRAM vendors outside of the group.  GSI further alleges that the Consortium,

23  with its combined market power and limited membership, created exclusive but de facto product

24  standards which allowed it to lock in customers and impede entry into the SRAM market, thereby

25  harming competition and consumers.

26  _____

27  [1] QDR stands for Quad Data Rate and is a type of memory that can transfer up to four words of data in each clock cycle.

28  [2] DDR stands for Double Date Rate and is a type of memory that can transfer up to two words of data in each clock cycle.

2

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    After establishing the industry standard with first and second generation devices and taking

2    control of the SRAM market, ████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████████████████

10   █████████████████████████████████████████

11   According to GSI, the Consortium and its members have ██████████████████████████

12   ████████████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████ As a direct result of the

14   Consortium's ███████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████ It is further alleged

18   that with each new product released, the Consortium █████████████████████████████████

19   ██████████████████████████████████████████████████████████████████████

20   ████████████████

21   In addition, Consortium members also required SRAM customers ███████████████████

22   ████████████████████████████████████████████████████████████████

23   ███████████████████████████████████████ By its conduct, the Consortium allegedly

24   harmed consumers by denying them the benefits of innovation in product development and lower

25   prices.

26   GSI filed its original Complaint in this case on July 22, 2011 against Cypress for: (1)

27   violation of section 1 of the Sherman Act, 15 U.S.C. § 1, (2) violation of California's Cartwright

28   Act, Business and Professions Code §§ 16720 and 16726, and (3) violation of California's Unfair

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1   Competition Law ("UCL"), Business and Professions Code § 17200 et. seq.  Dkt. No. 1.  Cypress

2   filed a motion to dismiss the Complaint on September 14, 2011.  Dkt. No. 14.  The Court denied

3   Cypress' motion to dismiss on July 6, 2012.  Dkt. No. 26.  On August 3, 2012, Cypress filed an

4   Answer to the Complaint, and on August 24, 2012, filed an Amended Answer.  Dkt. Nos. 34, 36.

5   On June 20, 2014, Cypress filed a Motion for Summary Judgment and Daubert Motions ("Cypress

6   Mot.").  Dkt. Nos. 86, 88.  On July 28, 2014, GSI filed an Opposition to Cypress' Motion for

7   Summary Judgment and Daubert Motions ("Opposition").  Dkt. No. 121.  In support of its

8   Opposition, GSI also filed multiple Declarations of Robert B. Haig ("Haig Decl."), Patrick T.

9   Chuang ("Chuang Decl."), Lee Lean Shu ("Shu Decl."), David Chapman ("Chapman Decl."),

10  Robert Murphy ("Murphy Decl."), Robert G. Harris ("Harris Decl."), D. Paul Regan ("Regan

11  Decl.").  Dkt. Nos. 128-134.

12       On August 25, 2014, Cypress filed (under seal) a Reply in Support of Motion for Summary

13  Judgment ("Cypress Reply").  Dkt. No. 173.  In support of its Reply, Cypress also filed a

14  Declaration of Dominique-Chantale Alepin and Exhibits A-Q under seal ("Alepin Decl.").  Dkt.

15  No. 174.  The parties appeared for a hearing on October 21, 2014.

16                                    **II. LEGAL STANDARD**

17       A motion for summary judgment should be granted if "there is no genuine dispute to any

18  material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. R. 56(c);

19  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The moving party bears the

20  initial burden of informing the court of the basis for the motion and identifying the portions of the

21  pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the

22  absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

23       If the moving party meets this initial burden, the burden then shifts to the non-moving party

24  to go beyond the pleadings and designate specific materials in the record to show that there is a

25  genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324.  The court must draw all

26  reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita

27  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

28

4

1   However, the mere suggestion that facts are in controversy, as well as conclusory or

2   speculative testimony in affidavits and moving papers, is not sufficient to defeat summary

3   judgment.  See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the

4   non-moving party must come forward with admissible evidence to satisfy the burden.  Fed. R. Civ.

5   P. 56(c); see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir.

6   1990).

7   A genuine issue for trial exists if the non-moving party presents evidence from which a

8   reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the

9   material issue in his or her favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

10   (1986); see also Barlow v. Ground, 943 F.2d 1132, 1134-36 (9th Cir. 1991).  Conversely, summary

11   judgment must be granted where a party "fails to make a showing sufficient to establish the

12   existence of an element essential to that party's case, on which that party will bear the burden of

13   proof at trial."  Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A.  Statute of Limitations

16   Before proceeding to the merits of Cypress' motion, the Court will address its assertion that

17   GSI's Sherman Act claims fail due to the expiration of the statute of limitations.  Cypress argues

18   that GSI's claims are barred by the statute of limitations because ███████████████████

19   ████████████████████████████████████████████████████   See Dkt. No.

20   101-6 at 13:5-18.  The Court disagrees.

21   Under both federal and state law, an antitrust and unfair competition suit must commence

22   within four years after the cause of action has accrued.  15 U.S.C. § 15B (Sherman Act); Cal. Bus.

23   & Prof. Code § 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL).  While private

24   antitrust claims are subject to four-year statute of limitations, a new cause of action arises "each

25   time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at

26   that time."  Hennegan v. Pacifico Creative Serv., 787 F.2d 1299, 1300 (9th Cir. 1986) (citing In re

27   Multidistrict Vehicle Air Pollution Litig., 591 F.2d 68, 70 (9th Cir. 1979)).  If a plaintiff "alleges a

28   continuing violation, an overt act by the defendant is required to restart the statute of limitations

5

United States District Court
For the Northern District of California

1    and the statute runs from the last overt act." <u>Pace Indus., Inc. v. Three Phoneix Co.</u>, 813 F.2d 234,

2    237 (9th Cir. 1987).  An overt act will restart the statute of limitations if: (1) it is a new and

3    independent act that is not merely a reaffirmation of a previous act; and (2) it inflicts new and

4    accumulating injury on the plaintiff. <u>Id.</u> at 238.

5        Here, GSI commenced this lawsuit on July 22, 2011.  <u>See</u> Dkt. No. 1.  Thus, the limitation

6    period begins on July 22, 2007. █████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ██████████████████████ <u>See</u> Exs. 103-06; <u>see also</u> Chapman Decl., ¶¶ 3, 9, 11.

9    ██████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████

15   ██████████████████████.[6]

16       GSI also alleges that, after █████████████████████████████████

17   ███████████████████████████████████████████[7]

18   Moreover, and most importantly, █████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   █████████████████.[8]  Cypress explains these statements by stating their announcements were

24   honest disclosures of market data.  But for this motion, the Court must draw all reasonable

25   [3] <u>See</u> Chapman Decl., ¶ 6

26   [4] <u>See</u> Ex. 11
     [5] <u>See</u> Ex. 77

27   [6] <u>See</u> Shu Decl., ¶ 6
     [7] <u>Compare</u>, <u>e.g.</u>, Ex. 60 at 388 (███████████████████████████████████████.

28   [8] Shu Decl., ¶ 7-8; Chapman Decl., ¶ 8, 11, 13; <u>see also</u> Dkt. No. 147-4 at 11:3-5.

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   inferences in GSI's favor where matters are disputed.  See Cahill v. Liberty Mut. Ins. Co., 80 F.3d

2   336, 337-38 (9th Cir. 1996).  Thus, at the very least, Cypress' public statements create a triable

3   issue of fact as to whether Cypress, █████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████ .  See Celotex, 477 U.S.

6   at 324.

7         Therefore, the Court must deny Cypress' motion to the extent it relies on the statute of

8   limitations because a genuine issue for trial exists.  GSI presented sufficient evidence from which a

9   reasonable jury, viewing the evidence in the light most favorable to GSI, could resolve this issue in

10   its favor.

11   **B.  Section 1 of the Sherman Act**

12         The Court now addresses the Sherman Act claim.  Cypress argues there is insufficient

13   evidence to establish a claim under § 1 of the Sherman Act because GSI failed to do the following:

14   (1) identify evidence showing an agreement intended to harm or restrain trade; (2) prove a relevant

15   product market encompassing all reasonably interchangeable products, show that it had market

16   power, and prove an anticompetitive effect on competition in a relevant product market, and (3)

17   present competent evidence to establish injury in fact.  Having reviewed the evidence, the Court

18   disagrees.

19         Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination . . .

20   or conspiracy [] in restraint of trade or commerce among several States."  Despite this broad

21   language, the Supreme Court has recognized that Congress intended only to "outlaw . . .

22   unreasonable restraints."  Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006); see also Thurman Indus.,

23   Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1373 (9th Cir. 1989).  Thus, to establish a claim

24   under Section 1, a plaintiff must show (1) that there was a contract, combination, or conspiracy; (2)

25   that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate

26   commerce.  See Hosp Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 (9th Cir. 1991); see also

27   Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008).

28

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Not all trade agreements can constitute antitrust violations; an agreement constitutes a

2    violation of § 1 of the Sherman Act only if it evidences a "conscious commitment to a common

3    scheme designed to achieve an unlawful objective." <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465

4    U.S. 752, 764 (1984).  Since it is often difficult to show direct evidence of a combination or

5    conspiracy, concerted action may be inferred from circumstantial evidence of the defendant's

6    conduct and course of dealings.  <u>See</u> <u>Blair Foods, Inc. v. Ranchers Cotton Oil</u>, 610 F.2d 665, 671

7    (9th Cir. 1980); <u>see also</u> <u>United States v. Gen. Motors Corp.</u>, 384 U.S. 127, 142-43 (1966).

8    Antitrust law, however, limits the range of permissible inferences from ambiguous evidence

9    in a § 1 case.  In that regard, "although plaintiffs are to be given the benefit of the doubt, they 'must

10   do more than simply show that there is some metaphysical doubt as to the material facts.'"  <u>In re</u>

11   <u>Citric Acid Litig.</u>, 191 F.3d 1090, 1094 (9th Cir. 1999) (quoting <u>Matsushita Elec. Indus., Ltd. v.</u>

12   <u>Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986)).  "[A]n inference of conspiracy is sustainable only

13   if 'reasonable in light of the competing inferences of independent action,' and 'to survive a motion

14   for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present

15   evidence that tends to exclude the possibility that the alleged conspirators acted independently."

16   <u>Id</u>. (quoting <u>Matsushita</u>, 475 U.S. at 888 (internal quotations omitted)).  Put another way, summary

17   judgment should be granted for the defendant unless the evidence as a whole would allow a

18   reasonable fact finder to conclude not just that the evidence is consistent with a conspiracy but that

19   the alleged conspiracy is more probable than not because "[m]ere circumstantial evidence of

20   conspiracy cannot defeat summary judgment unless it would allow an inference that conspiracy is

21   more probable than an inference of independent action."  II Philip E. Areeda et al., Antitrust Law ¶

22   308c (2d ed. 2000) (emphasis added).

23   **1.      Contract, Combination, or Conspiracy**

24   Cypress offers several explanations for why there is no direct evidence or an inference of an

25   agreement or conspiracy by the Consortium members to stifle innovation in the market.  First,

26   Cypress argues that GSI is unable to produce any evidence to support its contention ████████

27   ████████████████████████████████████████████████  <u>See</u> Dkt. No. 175-3 at

28   7.  In support of that point, Cypress indicates GSI's only evidence ████████████████

8

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    ████████████████████████████ See id.  Second, Cypress argues that the

2    Consortium █████████████████████████████████████████

3    ███████████████████████ See Dkt. No. 101-6 at 16:8-19.  Third,

4    ██████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████ See id. at 16-17.  Finally, Cypress argues that the ████████████

7    ███████████████████████████████████

8    ██████ See id. at 14:3-7.  In sum, Cypress' position is that the evidence does not support either an

9    inference of a conspiracy or an agreement to stifle innovation in the market through "vaporware."

10           In response, GSI provides circumstantial evidence that the Consortium members intended

11   to create significant barriers to entry, destroy competition, capture a dominant market share and

12   stifle innovation.[9]  Specifically, GSI offers evidence from which a conspiracy could be inferred,

13   including: █████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████

16   ████████████████████████████████████

17   ██████████████████████████████████████

18   ████████████████████████████████████

19   ██████████████████████.[14]

20          Although Cypress faults GSI for failing to produce any direct or circumstantial evidence

21   revealing anything more than economically rational decision to develop, produce and sell QDR-III

22   products the court finds that GSI has submitted circumstantial evidence tending to show that a

23   conspiracy between Cypress and the Consortium members is more probable than an inference of

24   independent action.  Indeed, as the relevant authorities reveal, that Cypress has not entered into an

[9] Ex. 7 at 39-42; Exs. 15-17; Ex. 18 at 28-9; Ex. 19 at 118-120; Exs. 20-24; Exs. 27-33; Exs. 34-38
[10] Exs. 1, 12, 60 and 110-112
[11] See Ex. 107; see also Murphy Decl., Ex. A at ¶ 26; Ex. 80 at 249-251; see also Ex. 79 at 982; Ex. 81; Ex. 18 at 100-101; Ex. 82 at 44-47, 162-164; Ex. 108 at 44-46
[12] Ex. 77 at 503; Ex. 78
[13] See Exs. 110-112
[14] Exs. 10-11

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  express agreement to engage in an antitrust conspiracy does not insulate it from liability under the

2  Sherman Act.  So long as the parties, in a meeting of the minds, coordinated horizontal behavior

3  with the purpose of committing a violation, they remain exposed.  See General Motors Corp., 383

4  U.S. 142-43 (finding that "explicit agreement is not a necessary part of a Sherman Act conspiracy,

5  certainly not where . . . joint and collaborative action was pervasive in the initiation, execution, and

6  fulfillment of the plan.").

7      As Cypress accurately states, none of the evidence necessarily excludes the possibility that

8  Cypress arrived at decisions on its own.  However, all that is necessary to avoid summary judgment

9  is evidence that reasonably tends to exclude that possibility.  GSI's evidence cumulatively

10  accomplishes this.  See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651,  661 (9th

11  Cir. 2002) (holding that no single piece of the evidence is sufficient in itself to prove a conspiracy,

12  the question

13  is whether this evidence, considered as a whole and in combination with the economic evidence, is

14  sufficient to defeat summary judgment).  Therefore, summary judgment is unwarranted on this

15  point because GSI's evidence, while not conclusive, creates a triable issue for the existence of a

16  conspiracy to act on these motives.

17      **2.      Unreasonably Restrain Trade or Competition**

18      As to the second element, Cypress argues that GSI failed to prove: ██████████████

19  ████████████████████████████████████████ ███████████████████████████████

20  ███████████████ ███████████████████████████████████████████████████████████

21  ██████████.[17]

22      Section 1 of the Sherman Act prohibits "[o]nly unreasonable or undue restraints" of trade.

23  OSC Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986) (citing Standard Oil v.

24  United States, 221 U.S. 1, 58-60 (1911)).  Courts generally identify restraints as unreasonable if

25  they raise price, reduce output, lower quality, eliminate customer choice, or create or enhance

26  market power.  See California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1133 (9th Cir. 2011);

---

[15] See Dkt. No. 101-6 at 19:7-23
[16] See id. at 21:3-7
[17] See id. at 23-25

10

United States District Court
For the Northern District of California

1    see also Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001).  "To demonstrate

2    market power circumstantially, a plaintiff must: (i) define the relevant market, (ii) show that the

3    defendant owns a dominant share of that market, and (iii) show that there are significant barriers to

4    entry and show that existing competitors lack the capacity to increase their output in the short run."

5    Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995).

6              **i.   Relevant Market**

7              Cypress asserts that there is no triable issue of fact as to the relevant product market.[18]  "A

8    relevant market, for antitrust purposes, can be broadly characterized in terms of the cross-elasticity

9    of demand for or reasonable interchangeability of a given set of products or services."  Coal. for

10   ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 507 (9th Cir. 2010) (citations and

11   internal quotations marks omitted).  Courts "consider whether the product and its substitutes are

12   reasonably interchangeable by consumers for the same purpose, as well as industry or public

13   recognition of the submarket as a separate economic entity, the product's peculiar characteristics

14   and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price

15   changes, and specialized vendors."  Id. (citations omitted).

16             Here, GSI's expert, Dr. Harris, opined that the ███████████████████████████

17   ████████████████████████████████████████████████████████████████████████

18   ████  ██████  ████████████████████  ████  ████████  ██████  ██████████

19   ████  See Harris Decl., Ex. A at 33-41.  However, Cypress argues that the ███████████

20   ████████████████████████████████████████████████████████████████████████

21   ██████████████████████████████████████  and as such should be included in the relevant

22   product market.  See Dkt. No. 86 at 9:24-10:22.  Additionally, Cypress argues that Dr. Harris, has

23   failed to use a reliable scientific method (mathematical test of cross-elasticity) to prove a relevant

24   product market encompassing all reasonably interchangeable products.  See Dkt. No. 80 at 5:17-

25   ───────────────────────

[18] Cypress also moved to exclude GSI's expert economist, Dr. Robert Harris, pursuant to Daubert v. Merrell Dow
Pharms., Inc., 509 U.S. 579 (1993).  That motion is denied by separate order.

[19] ███████████████████████████████████████

[20] █████████████████████████████████

[21] ████████████████████████████████████████

[22] ██████████████████████████████████

[23] ██████████████████████████████████████████████

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

8:11.  GSI, however, relied on identifying the existence of a product market by distinct prices, the product's peculiar characteristics and uses, industry or public recognition of the submarket as a separate economic entity, and sensitivity to price changes.  See Brown Shoe Co. v. United States, 370 U.S. 294 (1962); see also Knutson v. The Daily Review, Inc., 548 F.2d 795, 804 (9th Cir. 1976).

Since Harris will not be excluded, the disagreement between GSI and Cypress is at best a conflict between experts.  The Ninth Circuit has held that a dispute over the definition of the relevant product market is a "factual inquiry for the jury."  See Thurman Indus., 875 F.2d at 1374.  Because resolution of this factual question will require a number of conclusions to be drawn from the evidence, summary judgment would be improper.

### ii.   Market Power

Cypress asserts that whatever the collective market share of the Consortium's members, GSI does not contend that Cypress alone had market power in any relevant product market.  See Dkt. No. 101-6 at 21:8-21.  As a result, Cypress argues that there is no basis for a finding that the Consortium members had market power in any relevant market.  See id.

Market power is "the power to control prices or exclude competition."  Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997).  A high market share raises an inference of market power.  See Oahu Gas Service, Inc., v. Pacific Resources, Inc., 838 F.2d 360, 366 (9th Cir. 1988) (citing United States v. Grinnell Corp., 384 U.S. 563, 570 (1966)).  "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme."  Rebel Oil, 53 F.3d at 1439.  Conversely, a "declining market share may reflect an absence of market power, but it does not foreclose a finding of such power."  Oahu Gas, 838 F.2d 366 (citation omitted).

Here, Professor Harris opined that ███████████████████████████████████ ███████████████████████  Harris Decl., Ex. A at 42-45.  Cypress does not dispute that the Consortium commanded an overwhelming share of the SRAM market.  Nor does it dispute that GSI's expert shows that it held a substantial share of the market.  Instead, Cypress argues that it alone did not have market power in any relevant market and challenges the method by which GSI's

12

expert measures its market share.  <u>See</u> Dkt. No. 101-6 at 21.  However, Professor Harris provides

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████  <u>See</u> Harris Decl., Ex. A at 42.[24]  Again, the disagreement here between GSI and

Cypress regarding the method used by the GSI's expert is a conflict between experts that can only

be resolved by the jury.

Cypress's additional argument on this issue fares no better.  Cypress asserts that GSI must

show that new rivals are barred from entering the market and show that existing competitors lack

the capacity to expand their output.  <u>See</u> Dkt. No. 101-6 at 21.  Cypress argues that there were no

barriers to entry and expansion because ███████████████████████████████

████████████████████████████████████████████

████████████████  <u>See</u> Dkt. No. 175-3 at 10.

"A high market share, though it may ordinarily raise an inference of monopoly power, will

not do so in a market with low entry barriers or other evidence of a defendant's inability to control

prices or exclude competitors."  <u>Oahu Gas</u>, 838 F.2d at 366.  Barriers to entry include "(1) legal

license requirements; (2) control of an essential or superior resource; (3) entrenched buyer

preferences for established brands; (4) capital market evaluations imposing higher capital costs on

new entrants; and, in some situations, (5) economies of scale."  <u>Rebel Oil</u>, 51 F.3d at 1439.

Here, contrary to Cypress' contention that GSI did not incur any costs constituting barriers

to entry and expansion GSI provides evidence of significant barriers, including: ███████████

████████████████████████████████████████████████

████  █  ██████████████████████████████████████████████

_____

[24] ████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████  <u>See</u> Ex. 11.

[25] <u>See</u> Murphy Decl., Ex. A at ¶¶ 26, 79; Shu Decl., ¶¶ 3, 12. <u>See also</u> Ex. 18 at 120-121

█████████████████████████████; Ex. 114 ███████████████████████

██████████

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

[REDACTED]

[REDACTED]

Further, Cypress does not dispute that it controls the supply of QDR and DDR DRAM SRAM devices and their specifications, which can be understood to be [REDACTED] [REDACTED] [REDACTED] [28] Therefore, [REDACTED] [REDACTED], the Consortium greatly increased the market barrier. See Dkt. No. 147-4 at 21.

Cypress also claims that GSI's entry with the SigmaQuad IIIe reflects a lack of meaningful barriers to entry. See Dkt. No. 101-6 at 21. However, "[t]he fact that entry has occurred does not necessarily preclude the existence of significant entry barriers." Rebel Oil, 51 F.3d at 1440. GSI argues that its delayed entry was the result of significant expertise, overcoming lack of technical specifications, taking of risk, and great expenditure. See Dkt. No. 147-4 at 22.

Finally, Cypress argues that because GSI was able to enter with SigmaQuad IIIe, it shows that there are no barriers to expansion. This claim ignores the realities of GSI's position in the market. See Dkt. No. 101-6 at 21-22. GSI argues that making substantial additional units of the product takes months even if a company like GSI already has designed and sampled a particular variant of QDR or DDR SRAM. See Shu Decl. ¶¶ 12-13. In addition, response times only get longer if the competitor does not have timely access to Consortium designs and data. See Dkt. No. 147-4 at 22. Further, the customer qualification process restricted GSI's ability to increase output in the short run.[29] Therefore, GSI has provided sufficient evidence that barriers to entry and expansion existed in the relevant market.

Accordingly, through circumstantial evidence, GSI creates a triable issue of fact as to whether the Consortium had market power and whether significant barriers to entry and expansion

---

[26] See Ex. 18 at 65-68; Ex. 19 at 37 [REDACTED].

[27] See Ex. 115 at 264-265.

[28] See Dkt. No. 147-4 at 21; see also Ex. 42 at 138 [REDACTED] Ex. 18 at 18 [REDACTED] Ex. 43 at 59-62; Ex. 1 [REDACTED]; Chapman Decl., ¶¶ 4-5, 7.

[29] See Ex. 42 at 25-31; Ex. 43 at 100-101, 105-106.

United States District Court
For the Northern District of California

1   existed in the relevant market.  Therefore, summary judgment is not warranted on the ground that

2   the Consortium lacked market power.

3           iii.     **Anticompetitive Effect**

4           Cypress asserts that "the development of SigmaQuad IIIe as an alternative to QDR-III

5   amply demonstrated the absence of any anticompetitive effect from the alleged 'anti-innovation' to

6   supress QDR-III."  See Dkt. No. 101-6 at 23.  The Court disagrees.

7           "It can't be said often enough that the antitrust laws protect competition, not competitors."

8   United States v. Syufy Enters., 903 F.2d 659, 668 (9th Cir. 1990).   Consequently, "[t]o succeed on

9   a rule of reason claim, an antitrust plaintiff must prove that the restraint in question injures

10  competition in the relevant market."  Roberts Waikiki U-Drive, Inc. v. Budget Rent-A-Car, Inc.,

11  732 F.2d 1403, 1408 (9th Cir. 1984) (citing Kaplan v. Burroughs Corp., 611 F.2d 286, 291 (9th

12  Cir. 1979)).  With a horizontal agreement, the harm to one market competitor can be considered an

13  injury to competition "when the relevant market is both narrow and discrete and the market

14  participants are few."  Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d at 508-509 (9th

15  Cir. 1989).

16          Here, GSI offers evidence that the Consortium's conduct stymied innovation in the relevant

17  market and causally links vaporware announcements to the alleged harm.  See Dkt. No. 147-4 at

18  24-28.  First, GSI believed that QDR-III would be the industry standard because the first and

19  second generation Consortium devices represented the industry standard for QDR and DDR

20  SRAM.[30] ██████████████████████████████████████████

21  ████████████████████████████████████████

22  ██.[31]  Second, GSI provides evidence that Cypress ████████████████████

23  ████████████████████████████████████████████

24  ██████[32]  However, since GSI was ██████████████████████████

25  ████████████████████████████████████████

26  ――――――――――――――――――――
    [30] See Ex. 13 at 51; Ex. 18 at 18, 19, 26; Ex. 39 at 198-200.
27  [31] Shu Decl., ¶¶ 5-7; Chapman Decl., ¶¶ 7-9.
    [32] See Exs. 59, 60; Ex. 120 (████████████████████████████████████████████;
28  Shu Decl., ¶¶ 7-8; Chapman Decl., ¶¶ 8-9, 11.

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

██████████████████████████████ See Shu Decl., ¶¶ 7-8; Chapman Decl., ¶¶ 8-9, 11.  Third,

GSI argues that ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███ See Dkt. No. 147-4 at 24-25.  Therefore, █████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[33]  Finally, the harm to

GSI can be considered an injury to competition because the Consortium collectively had a

dominant share of the VHPS market - a market that was "both narrow and discrete" with few

market participants - over the period of interest.[34]

Cypress also asserts that the evidence does not show any unmet demand as a result of the

failure to develop QDR-III.  See Dkt. No. 101-6 at 23-25.  Moreover, Cypress argues that the

evidence shows that there was no anticompetitive effect because █████████████████████

███████████████████████████████ See id.  As such, Cypress argues that any harm hinges

on the implausible theory ██████████████████████████████████████████████████████

██████████████████████████ See id.

However, GSI argues that the vaporware's anticompetitive effect is not the Consortium's

failure to develop QDR-III, but the Consortium's behavior causing delay in the development of

SigmaQuad-IIIe (and the delay in successive generation of products).  See Dkt. No. 147-4 at 27.

An anticompetitive horizontal agreement requires exclusivity; for example, it may be a group of

firms that are committed to a particular existing technology or method of doing business and make

horizontal agreements designed either to prevent their members from developing or switching to

alternative technologies or methods or else to exclude from the market other firms threatening to

employ such alternatives.[35]  GSI argues that the Consortium's actions hindered innovation by

---

[33] Shu Decl., ¶ 7-8; Chapman Decl., ¶ 8, 11, 13; see also Dkt. No. 147-4 at 11:3-5, 26-27.

[34] Harris Decl., Ex. A at 42-45.

[35] See Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993) (defendant insurers allegedly agreed to deny risk data and reinsurance to competing insurers wishing to write broader coverage that the defendants wished to remove from the market); see also Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988) (cartel of steel conduit makers conspire to keep plastic conduit off the market); see also American Med. Assn. v. United States, 317 U.S. 519 (1943) (agreement preventing members and excluding other physicians from working for prepaid health plans).

16

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    ██████████████████████████████████████████████████  See Chapman Decl., ¶¶

2    8-9.  For example, ████████████████████████████████████████████

3    ██████████████████████████████████████████████████

4    ████  See Haig Decl., ¶¶ 10-12.  Therefore, ████████████████████████████

5    ██████████████████████████████████████████████████

6    ██████████████████████████████████  See Hartford Fire, 509 U.S. 764.

7        GSI also argues that customers ████████████████████████████████████

8    ██████████████████████████████████████████████████  Dkt.

9    No. 147-4 at 24:18-20.  Therefore, GSI claims that Cypress' ████████████████

10   ██████████████████████████████████████████████████

11   ████████████████████████████  Free Freehand Corp. v. Adobe Systems, Inc., 852 F.

12   Supp. 2d 1171, 1185 (N.D. Cal. 2012).  Therefore, summary judgment on this point is

13   inappropriate.

14        In sum, the Court concludes that GSI has come forward with sufficient evidence by way of

15   the expert testimony and the circumstantial evidence to create a triable issue of fact as to whether

16   Cypress along with the Consortium members intended to harm competition.

17        **C. Injury-in-Fact**

18        Cypress' final argument in favor of summary judgment is that GSI failed to show any

19   causal link between GSI's alleged injury and the "vaporware" conduct that it alleges against

20   Cypress and the other members of the Consortium.  See Dkt. No. 101-6 at 26:10-18.  Specifically,

21   Cypress contends that GSI cannot establish injury-in-fact because: (1) there is no evidence that the

22   Consortium's "vaporware" delayed SigmaQuad-IIIe's development, and (2) there is no evidence

23   that, if SigmaQuad-IIIe were developed one year earlier, there would have been any customer

24   demand for the device.  See id. at 25-30.

25        To survive summary judgment, Plaintiff must also show that they suffered a cognizable

26   injury resulting from Defendants alleged conspiracy.  See Matsushita, 475 U.S. at 585-86.

27   "Antitrust injury is defined not merely as injury caused by an antitrust violation, but more

28   restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from

17

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    that which makes defendants' acts unlawful.'" <u>Glen Holly Entm't, Inc. v. Tektronix, Inc.</u>, 352 F.3d

2    367, 371 (9th Cir. 2002) (citing <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489

3    (1977).  The intentions of the antitrust laws are well synthesized in <u>Apex Hosiery Co. v. Leader</u>,

4    310 U.S. 469 (1940):

> The end sought [by the Sherman Act's prohibition against
> unreasonable restraints of trade] was the prevention of restraints to
> free competition in business and commercial transactions which
> tended to restrict production, raise prices or *otherwise control the
> market to the detriment of purchasers or consumers of goods and
> services*, all of which had come to be regarded as a special form of
> public injury.

9    Id. at 493 (emphasis added).  Thus, "the central purpose of the antitrust laws, state and federal, is to

10    preserve competition.'" <u>Knevelbaard Dairies v. Kraft Foods, Inc.</u>, 232 F.3d 979, 988 (9th Cir.

11    2000).  "Every precedent in the field makes clear that the interaction of competitive forces . . . is

12    what will benefit consumers."  <u>Id.</u>  In addition, the Ninth Circuit requires that the injured party be a

13    participant in the same market as the alleged malefactors.  <u>Glen Holly Entm't</u>, 352 F.3d at 372.

14        Here, GSI asserts that Cypress' alleged conduct is the type that antitrust laws were intended

15    to prevent because GSI's evidence shows that Cypress denied consumers the benefits of innovation

16    in product development and lower prices.  <u>See</u> <u>Rebel Oil</u>, 53 F.3d at 1433 (holding that consumer

17    welfare is maximized when economic resources are allocated to their best use and when consumers

18    are assured competitive price and quality).  ████████████████████████████

19    ████████████████████████████████████████████████████████████

20    ██████████████████████████████████████████████████████

21    ████████████████████████████████████.[36]  Moreover, GSI

22    argues that ████████████████████████████████████████████

23    ████████████████ <u>Id.</u>  Again, the evidence discussed in the section above demonstrates that

24    ██████████████████████████████████.  <u>See</u> Haig Decl., ¶¶ 10-

25    12.  Therefore, GSI provides evidence showing that Cypress caused an antitrust injury to GSI

26    under the Ninth Circuit's requirements.

27

28

---

[36] Shu Decl., ¶ 7-8; Chapman Decl., ¶ 8, 11, 13; <u>see also</u> Dkt. No. 147-4 at 11:3-5, 26-27.

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, Cypress argues that GSI's damages expert, D. Paul Regan's ("Regan"), economic model does not provide a reasonable basis to estimate "lost profits" from the alleged delay of the production of SigmaQuad-IIIe.  <u>See</u> Dkt. No. 101-6 at 27-28.  However, GSI argues that Regan's market and sales analysis is soundly based on GSI's actual sales of SigmaQuad-IIIe and Cypress' own market demand projections.  <u>See</u> Regan Decl., ¶¶ 6-7.

Although Cypress argues that GSI cannot prove antitrust injury, the substance of Cypress' arguments target GSI's damages calculations.  Cypress asserts that Regan relies on faulty analytical methods or mere guesswork.  But the arguable inaccuracy of Regan's damages calculations is not grounds for granting summary judgment.  The credibility and persuasiveness of GSI's expert witnesses are issues best left to a factfinder.  Until a factfinder is given an opportunity to assess the disputed facts underlying GSI's theory, the issue of antitrust injury is not ripe for summary judgment.

## IV. CONCLUSION

At this point, GSI has raised enough issues of contested material fact to preclude summary judgment on the merits for this case.   Accordingly, Cypress' motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: January 27, 2015



EDWARD J. DAVILA
United States District Judge

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**RULINGS RE DEFENDANTS' EVIDENTIARY OBJECTIONS (DKT. NO. 175-3)**

| Schaberg Ex. | Evidentiary Objections | Ruling |
|---|---|---|
| 40 | Hearsay (FRE 802) and lack of foundation/personal knowledge (FRE 602) as to what Mr. Raposa was interested in. | Overruled.  Fed. R. Evid. 803(3). |
| 43 | Hearsay (FRE 802) and lack of foundation/personal knowledge/speculation (FRE 602) as to what Cisco told Mr. Stoll and what Cisco's preferences were | Overruled.  Fed. R. Evid. 803(3). |
| 49 | Hearsay (FRE 802) and lack of authentication (FRE 901) | Overruled.  Fed. R. Evid. 803(3), 901(4). |
| 70-71 | Lack of foundation (FRE 602) as to two presentations | Overruled. |
| 72 | Lack of foundation (FRE 602) | Overruled. |
| 73 | Lack of foundation (FRE 602) | Overruled. |
| 74 | Double hearsay (FRE 802) as to email and Renesas's website; lack of authentication (FRE 901); lack of foundation/personal knowledge (FRE 602) | Overruled.  Fed. R. Evid. 803(3) |
| 83 | Hearsay (FRE 802) and lack of authentication (FRE 901) | Overruled.  Fed. R. Evid. 803(3), 902(6). |
| 101 | Hearsay (FRE 802) and lack of foundation/personal knowledge (FRE 602) | Overruled.  Fed. R. Evid. 702, 703. |
| 120 | Hearsay (FRE 802) as to what customer said | Overruled.  Fed. R. Evid. 803. |
| 121 | Double hearsay (FRE 802) as to conversation with Alcatel Lucent | Overruled.  Fed. R. Evid. 803(3). |
| 122 | Double hearsay (FRE 802) as to conversation with Alcatel Lucent | Overruled.  Fed. R. Evid. 803(3). |
| 123 | Double hearsay (FRE 802) as to conversation with Alcatel Lucent | Overruled.  Fed. R. Evid. 803(3). |
| Declaration of Robert B. Haig (Dkt. 128) | Lack of foundation/personal knowledge (FRE 602): 2:11-14; 2:17-20; 2:21-23; 2:24-28; 3:3-6; 3:7-12 | Overruled.  Fed. R. Evid. 803(3). |

20

| | | | |
|---|---|---|---|
| 1 | | Hearsay (FRE 802): 2:21-23; 3:1-6 | |
| 2 3 4 5 6 | Declaration of Patrick T. Chuang (Dkt. 129) | Lack of foundation/personal knowledge (FRE 602): 2:21-3:3; 3:6-8<br><br>Impermissible lay opinion testimony (FRE 701); 2:21-3:3; 3:6-8 | Overruled. |
| 7 8 9 10 | Declaration of Lee Shu (Dkt. 130) | Lack of foundation/personal knowledge (FRE 602): 1:22-26; 1:27; 2:19-21; 2:23-27; (Speculation); 3:12-14; 3:27-28; 4:2-3<br><br>Hearsay (FRE 802): 3:12-14 | Overruled.  Fed. R. Evid. 803(3) |
| 11 12 13 14 15 16 17 18 | Declaration of David B. Chapman (Dkt. 131) | Lack of foundation/personal knowledge (FRE 602): 1:16-17; 1:18-20; 1:21- 1:23; 1:25-2:9; 2:12-25; 3:25-4:2; 4:19-21; 4:26-28<br><br>Impermissible lay opinion testimony (FRE 701): 1:21-23; 2:9-10; 3:25-28<br><br>Hearsay (FRE 802): 3:10- 11; 3:18-20; 3:21-24; 4:2-4; 4:4-4-7; 4:13-14; 4:19- 21; 4:22-24 | Overruled.  Fed. R. Evid. 803(3) |
| 19 20 | Declaration of Didier Lasserre (Dkt. 145) | Lack of foundation/personal knowledge (FRE 602): 1:8-9 | Overruled. |
| 21 22 23 | Chuang Declaration (Dkt. 129) ¶ 5 | Deposition of Patrick Chuang (May 19, 2014) (Alepin Declaration Ex. L) at 184:13-23; 194:1-17; 225:4-9; 298:9-299:24 | Overruled.  Fed. R. Evid. 702. |
| 24 25 | Shu Declaration (Dkt. 130) ¶ 7 | Deposition of Lee-Lean Shu (June 10, 2014) at: 374:3-14; 378:13-23; 502:22-24; 504:20-506:11; 508:23-509:9 | Overruled. |
| 26 27 28 | Chapman Declaration (Dkt. 131) ¶ 11 | CX 30 at 603: ██████████<br>██████████<br>██████████ | Overruled. |

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT



| | Chapman Declaration (Dkt. 131) ¶ 7 | Shu Declaration at ¶ 9: | Overruled. |

Case No.: 5:11-CV-03613-EJD
ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT